**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-2496
_____

CARDIONET, INC.;
LIFEWATCH SERVICES, INC.,
                                        Appellants
                        v.

CIGNA HEALTH CORPORATION

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(No. 2:13 Civ. 00191)
District Judge: Honorable Eduardo C. Robreno
_____

Argued: January 22, 2014

Before: FUENTES, FISHER, *Circuit Judges*, and STARK,
*District Judge*.[1]

---

[1] Honorable Leonard P. Stark, United States District Court
Judge for the District of Delaware, sitting by designation.

(Filed: May 6, 2014)
_____

Mark H. Gallant, Esq. [ARGUED]
Raymond A. Kresge, Esq.
Aaron Krauss, Esq.
Robert A. Chu, Esq.
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
        *Attorneys for Appellants*

Paul M. Hummer, Esq. [ARGUED]
Saul Ewing LLP
1500 Market Street,
38th Floor, Centre Square West
Philadelphia, PA 19102
        *Attorney for Appellee*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*:

CardioNet, Inc. and LifeWatch Services, Inc. are providers of medical devices that allow physicians to monitor cardiac arrhythmias in patients not confined to the hospital. For several years, CIGNA Health Corporation provided coverage for this service. Then, in 2012, CIGNA reversed course and announced that it would no longer do so.

2

CardioNet and LifeWatch filed this action against CIGNA on their own behalf and as the assignee of patients who used their services. In response, CIGNA moved to compel arbitration under the parties' agreement. The District Court agreed with CIGNA that CardioNet and LifeWatch's claims fell within the arbitration clause of the parties' agreement and therefore compelled arbitration. Because we conclude that none of CardioNet and LifeWatch's claims fall within the arbitration clause, we vacate the District Court's judgment and remand for further proceedings.

I.[2]

A.

---

[2] CIGNA bases its motion to compel arbitration on language in the parties' contracts. Those contracts, though not appended to the Complaint, are integral to, and referenced in, the Complaint. Because the arbitration clause at issue appears in a contract relied upon in the Complaint, we resolve the motion to compel arbitration under a motion to dismiss standard, *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773-75 (3d Cir. 2013), and accept as true the factual allegations set forth in the Complaint, *Bell v. Cheswick Generating Station*, 734 F.3d 188, 192 n.2 (3d Cir. 2013). We are also permitted to consider the substance of the contracts that ostensibly compel arbitration. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (noting that "a document integral to or explicitly relied upon in the complaint may be considered" at the motion to dismiss stage (quotation marks and emphasis omitted)).

CardioNet, Inc. and LifeWatch Services, Inc. (together, "the Providers") supply outpatient cardiac telemetry ("OCT") services. OCT, an outpatient device, is used by physicians, usually cardiologists, to monitor cardiac arrhythmias. The device differs from conventional technologies for detecting arrhythmias in that it transmits electrocardiographic ("EKG") data in real time to certified technicians, who then forward the data to the ordering physician. OCT is approved by the Food and Drug Administration, and has been covered by Medicare and commercial insurers for many years.

CIGNA Healthcare Corporation administers employer sponsored health and welfare benefit plans across the country. Like other health insurance companies, CIGNA maintains a network of health care providers. Pursuant to individual agreements between CIGNA and its in-network providers, CIGNA pays the providers directly for the services rendered to patients.

In 2007, CardioNet and LifeWatch joined CIGNA's provider network by entering into identical Administrative Service Agreements with CIGNA ("the Agreement"). The Agreement sets the rate at which CIGNA would reimburse the Providers for the particular services rendered to CIGNA patients. It also circumscribes the services for which reimbursement is available. Specifically, the Providers' services are reimbursable under the Agreement only if they constitute "Covered Services." App. at 65, 72. The Agreement defines "Covered Services" as "those health care services for which a Participant is entitled to receive coverage under the terms and conditions of the Participant's Benefit

4

Plan." *Id*. at 64.[3]  According to the Agreement, "[n]o service is a Covered Service unless it is Medically Necessary," that is it "satisfies the Medical Necessity requirements under the applicable Benefit Plan." *Id*.

B.

CIGNA first announced a policy of covering OCT in 2007.  At the time, it determined that there was "sufficient evidence in the published peer reviewed medical literature supporting the use of home-based, real-time surveillance systems."  App. at 35.  CIGNA maintained and reaffirmed its policy of covering OCT each year through 2011.  But then, in 2012, it abruptly terminated its coverage of OCT; CIGNA then issued a new policy statement, entitled 2012 Cardiac Event Monitor Coverage Policy ("the 2012 Policy"), announcing that it would no longer cover OCT "for any indication because it is considered experimental, investigational or unproven."  *Id.* at 25, 37.  The 2012 Policy acknowledged, however, that this new position would be trumped by any conflicting language in the coverage policies themselves.

Although CIGNA's OCT policy had changed, its medical knowledge had not: CIGNA relied on the same medical literature it had previously relied upon in concluding that OCT should be covered.  Shortly after CIGNA's announcement, the Providers asked CIGNA to reconsider its new position on OCT.  According to the Complaint, CIGNA

---

[3] The Agreement defines "Participant" as "any individual, or eligible dependent of such individual, . . . who is eligible and enrolled to receive Covered Services."  *Id*.

5

intimated to the Providers that its motive for reversing course was financial, but refused to back away from the 2012 Policy.

Subsequently, CIGNA issued Medical Coverage Policy Updates for Heath Care Professionals ("the Physician Update") to hundreds of thousands of its network physicians, announcing that it would not cover OCT "for any indication because it is considered [experimental, investigational, and unproven]." App. 40-41. By letter, CardioNet objected to CIGNA's characterization of OCT as experimental, investigational, and unproven. CardioNet's letter also observed that CIGNA's unequivocal statement that CIGNA would not cover OCT "for any indications" conflicted with its acknowledgement in the 2012 Policy that CIGNA's new position could be trumped by the specific coverage policies included in employee benefit plans. *Id.* CIGNA neither responded to the letter nor amended the Physician Update. The Providers allege that the Physician Update not only prevented patients with CIGNA insurance from ordering OCT, but also "has caused and continues to cause physicians to refrain from ordering OCT for patients whose employer plans . . . do cover OCT." *Id.* at 41.

C.

The Providers filed this action in the Eastern District of Pennsylvania, "on their own behalves and as assignees of the rights and claims of patients." App. at 24. The Complaint contains seven counts. The Providers bring Counts I-IV as the assignees of the claims of five CIGNA plan participants ("the Participants"). The Participants all sought coverage for OCT after the implementation of the 2012 Policy, and were all denied coverage by CIGNA. After CIGNA denied

6

coverage, the Participants received OCT from the Providers, and in exchange assigned to the Providers "all of [their] rights (without limitation) under the Employee Retirement Income Security Act of 1974 (ERISA) . . . along with any other rights under federal or state law that [they] may have as related to the reimbursement of coverage" for the uncovered treatment. *Id*. at 284.

Counts I-IV, the so-called "derivative" counts, challenge CIGNA's decision to deny the Participants OCT coverage; the Providers bring these claims standing in the shoes of the Participants. Specifically, in Count I, the Providers allege that CIGNA arbitrarily and capriciously changed its OCT coverage policy, and seek to recover benefits due under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). In Count II, the Providers seek an injunction, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), directing CIGNA to withdraw its current coverage policy for OCT and rescind the Physician Update regarding OCT. In Count III, the Providers allege that, by systematically denying OCT coverage, CIGNA breached its duty to the Participants to faithfully apply the terms of the governing ERISA plans; they seek an injunction, pursuant to ERISA § 502(a)(3), "requiring CIGNA to process claims for OCT benefits in all instances based on the terms of the ERISA plans . . . and to cease and desist from processing such ERISA claims based on any conflicting terms . . . in the 2012 [] Policy." App. 52. To the extent that any of the assigned claims do not arise from or are exempt from ERISA, Count IV asserts that CIGNA breached its contractual obligation to the Participants by failing to cover medically necessary services.

7

CardioNet and LifeWatch bring the remaining three counts on their own behalf. These so-called "direct" counts primarily concern an alleged harm stemming from CIGNA's distribution of the Physician Update. In Count V, the Providers allege that through the issuance of the Physician Update, CIGNA tortiously interfered with the Providers' current and prospective business relations with physicians who have ordered, or may in the future order, OCT for their patients. In Count VI, they allege that the Physician Update constituted a misleading and deceptive commercial or promotion, in violation of § 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). Finally, Count VII alleges that the Physician Update constituted trade libel. Through Counts V-VII, the Providers seek damages, as well as the issuance of corrective advertising to the physicians who received the Physician Update.

Shortly after CardioNet and LifeWatch filed this action, CIGNA moved to compel arbitration, or in the alternative, to stay the action pending arbitration, under Rule 12(b)(6) of the Federal Rules of Civil Procedure and the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3-4.[4] The District Court agreed with CIGNA that all of the Providers' claims, including those brought on behalf of the Participants, fell within the purview of the Agreement's arbitration clause. It therefore compelled arbitration.

The District Court began by analyzing the relevant language in the Agreement concerning arbitration. It

---

[4] CIGNA also moved to dismiss the Providers' claims on other grounds. However, the District Court declined to reach these alternative arguments.

concluded that the arbitration provision was broad, so that the presumption in favor of arbitration applied with particular force. *CardioNet, Inc. v. Cigna Health Corp.*, 945 F. Supp. 2d 620, 625-26 (E.D. Pa. 2013). The Court then assessed the arbitrability of the derivative and direct claims in turn. As to the derivative claims, the District Court acknowledged that the Agreement's arbitration clause could not bind the Participants, as "an arbitration clause applies only to the parties to the agreement in which it is contained and those with whom there is privity of contract." *Id.* at 627. Nonetheless, it concluded that the Providers could not "pursue the Plan Participants' claims [in court] through an assignment from the Plan Participants to Plaintiffs." *Id.* The District Court reasoned that:

> Plaintiffs have a preexisting duty under their agreements with CIGNA to arbitrate disputes that are substantively identical to the claims they now seek to bring as assignees. All of Plaintiffs' claims rest on the basic argument that OCT services should be covered services and therefore should be paid for by CIGNA. This argument strikes at the heart of Plaintiffs' contracts with CIGNA, i.e., claims for payment by Plaintiffs will be subject to arbitration. Plaintiffs cannot nullify their agreements to arbitrate these claims for payment by becoming assignees of the Plan Participants' claims.

*Id*. Accordingly, the District Court concluded that, while "[o]f course, the Plan Participants are free to pursue their claims independently, or via an assignment to another third party, . . . [i]f Plaintiffs wish to challenge Defendant's

9

classification of OCT services as [experimental, investigative, and unproven], they must arbitrate their claims, as they had agreed to do under the [Agreement]." *Id.*

The District Court next evaluated the direct claims. These too, it determined, were barred by the Agreement's arbitration clause. The District Court explained that "the foundation of Counts V through VII"—the Providers' allegation that the Physician Update deterred physicians from ordering OCT—"clearly falls within the scope of the [Agreement's] arbitration clauses. To the extent that Plaintiffs disagree on whether OCT services should be classified as [experimental, investigative, and unproven] or as covered, this disagreement must be resolved under the terms of the arbitration provision." *Id.* at 628.

The Providers now appeal the compulsion of arbitration of both the direct and the derivative claims.[5]

## II.

### A.

In the vast majority of cases, the arbitrability of a dispute is a question for judicial determination. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)

---

[5] The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367(a). We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 and 9 U.S.C. § 16(a)(3). We exercise "plenary review over the District Court's order compelling arbitration." *Bouriez v. Carnegie Mellon Univ.*, 359 F.3d 292, 294 (3d Cir. 2004).

("Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)) (alterations in original). Because neither party questions the propriety of the District Court determining whether the dispute is arbitrable, we assume, without further analysis, that the Agreement leaves the question of arbitrability to judicial determination. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 130 S. Ct. 2847, 2856 n.5 (2010).

Until a court determines whether arbitration should be compelled, however, judicial review is limited to two threshold questions: "(1) Did the parties seeking or resisting arbitration enter into a valid arbitration agreement? (2) Does the dispute between those parties fall with the language of the arbitration agreement?" *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132, 137 (3d Cir. 1998). Because neither party contests the validity of the Agreement, we confine ourselves to assessing whether the disputes at issue fall within the scope of the Agreement's arbitration clause.

The FAA, 9 U.S.C. §§ 1-13, establishes "a uniform federal law over contracts which fall within its scope." *Goodwin v. Elkins & Co.*, 730 F.2d 99, 108 (3d Cir. 1984). This uniform federal law places "arbitration agreements on an equal footing with other contracts," and requires courts to "enforce them according to their terms." *AT & T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1745 (2011); *see also Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 130 S.Ct. 2772, 2776 (2010) ("The FAA reflects the fundamental principle that arbitration is a matter of contract."); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985) ("The

11

preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate . . . ."). Thus, where a written agreement evidences an intent on the part of the contracting parties to arbitrate the dispute in question, a court must compel the parties to arbitrate that dispute. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

But the fact that the parties have agreed to arbitrate some disputes does not necessarily manifest an intent to arbitrate every dispute that might arise between the parties, since "[u]nder the FAA, 'parties are generally free to structure their arbitration agreements as they see fit.'" *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 458 (2003) (Rehnquist, J., dissenting) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)). Accordingly, "a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." *Granite Rock*, 130 S. Ct. at 2856 (emphasis in original). Ultimately, then, whether a dispute falls within the scope of an arbitration clause depends upon the relationship between (1) the breadth of the arbitration clause, and (2) the nature of the given claim.

We must resolve "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983); *see also Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 55 (3d Cir. 2001) (noting that "federal policy favors arbitration"). However, the Supreme Court has repeatedly warned against

12

"overread[ing its] precedent[]" concerning the presumption of arbitrability. *E.g. Granite Rock*, 130 S. Ct. at 2857. The presumption in favor of arbitration does not "take[] courts outside [the] settled framework" of using principles of contract interpretation to determine the scope of an arbitration clause. *Id.* at 2859. Quite the contrary, the presumption "derives its legitimacy from" the judicial supposition "that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed and (absent a provision clearly and validly committing such issues to an arbitrator) is legally enforceable and best construed to encompass the dispute." *Id.* at 2859-60; *see also Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd*., 1 F.3d 639, 641 (7th Cir. 1993). Indeed, while the FAA "embodies a strong federal policy in favor of arbitration, . . . the duty to arbitrate remains one assumed by contract." *Sweet Dreams Unlimited*, 1 F.3d at 641. Thus, the presumption of arbitrability applies only where an arbitration agreement is ambiguous about whether it covers the dispute at hand. *See Granite Rock*, 130 S. Ct. at 2858-59. Otherwise, the plain language of the contract controls.

In assessing whether a particular dispute falls within the scope of an arbitration clause, we "focus [] on the factual underpinnings of the claim rather than the legal theory alleged in the complaint." *Medtronic AVE, Inc.*, 247 F.3d at 55 (quotation marks omitted). In so doing, we "prevent[] a creative and artful pleader from drafting around an otherwise-applicable arbitration clause." *Chelsea Family Pharmacy, PLLC v. Medco Health Solutions, Inc.*, 567 F.3d 1191, 1198 (10th Cir. 2009).

B.

We begin by "carefully analyz[ing] the contractual language" in the arbitration clause at issue. *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 888 (3d Cir. 1992). The Agreement contains the following two paragraphs concerning alternative dispute resolution, and no other:[6]

> 6.3 <u>Internal Dispute Resolution</u>. *Disputes that might arise between the parties regarding the performance or interpretation of the Agreement* must first be resolved through the applicable internal dispute resolution process outlined in the Administrative Guidelines. In the event the dispute is not resolved through that process, either party can request in writing that the parties attempt in good faith to resolve the dispute promptly by negotiation . . . . If the matter is not resolved within 60 days of such a request, *either party may initiate arbitration* by providing written notice to the other. With respect to a payment or termination dispute, Provider must submit a request for arbitration within 12 months . . . If arbitration is not requested within that 12 month period, CIGNA's final decision under its internal dispute resolution process will be binding on Provider, and Provider shall not bill CIGNA,

---

[6] The full text of Sections 6.3 and 6.4 is set forth in Appendix "A" to this Opinion.

14

Payor or the Participant for any payment denied because of the failure to timely submit a request for arbitration.

6.4   <u>Arbitration</u>.   *If the dispute is not resolved through CIGNA's internal dispute resolution process, either party can initiate arbitration by providing written notice to the other.*   If one of the parties initiates arbitration, the proceeding will be held in the jurisdiction of Provider's domicile.   The parties will jointly appoint a mutually acceptable arbitrator. . . .   *Arbitration is the exclusive remedy for the resolutions of disputes under this Agreement.*   The decision of the arbitrator will be final, conclusive and binding . . . .

App. 69 (emphasis added).

The above-quoted language makes clear that only those disputes "regarding the performance or interpretation of the Agreement" must be arbitrated.   True, the phrase "regarding the performance or interpretation of the Agreement" appears in the internal dispute resolution paragraph (Section 6.3), rather than the mandatory arbitration paragraph (Section 6.4).   But it is clear from the language of the two sections that the parties intended them to be read together, as two stages of mandatory dispute resolution. Section 6.3 explains that where a dispute subject to that provision cannot be resolved using the internal dispute resolution process, "either party may initiate arbitration." Section 6.4 then outlines what form such an arbitration will take.  The first sentence of Section 6.4 requires arbitration not

15

of "all" or "any" disputes between the parties, but of only "the dispute" that the parties failed to resolve through the internal process outlined in Section 6.3. Hence, Section 6.4 mandates the arbitration of only those disputes subject to the internal dispute resolution process outlined in Section 6.3. And Section 6.3 only applies to those "[d]isputes that might arise between the parties concerning the performance and interpretation of the Agreement." Accordingly, Section 6.4 must be limited to disputes concerning the Agreement's "performance or interpretation."

The District Court similarly reached the conclusion that Sections 6.3 and 6.4 call for "the arbitration of disputes related to the 'interpretation or performance' of the agreement." *CardioNet*, 945 F. Supp. 2d at 626. The District Court intimated, however, that the statement in the middle of Section 6.4 that "[a]rbitration is the exclusive remedy for the resolutions of disputes under this Agreement" broadens the scope of mandatory arbitration. *Id.* We believe that the term "disputes" as used here refers solely to those disputes concerning the "performance or interpretation of the Agreement." As we have explained previously, courts "are required to read contract language in a way that allows all the language to be read together, reconciling conflicts in the language without rendering any of it nugatory if possible." *CTF Hotel Holding, Inc. v. Marriott Int'l, Inc.*, 381 F.3d 131, 137 (3d Cir. 2004). Were we to hold that "disputes" as used here signifies a broader swath of disagreements, it would render the first sentence of Section 6.4 devoid of meaning. Moreover, as the Providers note, the words "dispute" and "disputes" are used three other times in these two sections, each time clearly referring to the narrower set of disputes concerning the Agreement's performance and interpretation.

16

Accordingly, we believe that the word "disputes," as employed here, must be circumscribed. *See* Restatement (Second) of Contracts § 202 cmt. d ("Meaning is inevitably dependent on context. A word changes meaning when it becomes part of a sentence, the sentence when it becomes part of a paragraph.").

We therefore conclude that the arbitration clause in this case is limited in scope to disputes "regarding the performance or interpretation of the Agreement."[7]

---

[7] The parties spend sizeable portions of their briefs disputing whether this arbitration clause is properly categorized as "broad" or "narrow." The presumption of arbitrability is "particularly applicable" where the arbitration clause is a broad one. *AT & T Techs.*, 475 U.S. at 650. However, as we have noted, the presumption of arbitrability is relevant only where the scope of the arbitration clause is ambiguous. *See Granite Rock*, 130 S. Ct. at 2858-60. Here, the arbitration provision is not ambiguous. In any event, as the arbitration provision here "implicate[s only] interpretation or performance of the contract per se," it does not sweep beyond the confines of the contract, and is therefore narrow in scope. *Sweet Dreams*, 1 F.3d at 642; *see also Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983) (contrasting arbitration clauses that sweep broadly with those "intended to cover a much narrower scope of disputes, *i.e.*, only those relating to the interpretation and performance of the contract itself"); *cf. Battaglia v. McKendry*, 233 F.3d 720, 724-25 (3d Cir. 2000) (an arbitration clause not "limited to disputes involving the interpretation and performance of the Settlement Agreement" is broad).

17

C.

We next consider whether the claims at issue relate to the performance or interpretation of the Agreement.

First, we examine whether the Providers' direct claims fall under the scope of the arbitration clause. CIGNA contends that the direct claims relate to the performance and interpretation of the Agreement, because they "unavoidably implicate Cigna's contractual obligation to treat as 'Covered Services' any services that participants are entitled to receive under their benefits plans." Appellee's Br. at 30. We disagree.

Again, in determining whether these claims at issue relate to the performance and interpretation of the Agreement, we focus on the factual underpinnings of the claim rather than the legal theories asserted in the Complaint. Although styled as distinct statutory and common law causes of action, the Providers' trade libel, Lanham Act, and tortious interference claims rest upon identical factual assertions: CIGNA made false and misleading statements in the Physician Update about the nature and quality of OCT; CIGNA conveyed the false impression that OCT would never be covered under any health plans CIGNA administers; and the Physician Update injured them by decreasing the number of physicians willing to use OCT services.[8]

---

[8] We take no position here on CIGNA's argument in the District Court that the direct counts fail to state cognizable claims. We simply assume for the time being that they do.

18

Thus, the adjudication of CIGNA's direct claims depends on whether *the Physician Update*—a document completely distinct from the Agreement—is deceptive and misleading, and whether any deceptions therein caused a cognizable injury to the Providers. The resolution of these claims does not require construction of, or even reference to, any provision in the Agreement. *Cf. RCM Techs., Inc. v. Brignik Tech., Inc.*, 137 F. Supp. 2d 550, 555 (D.N.J. 2001) (fraudulent inducement claims were subject to arbitration where "the claims in this case almost undoubtedly will require interpretation of the parties' agreement"). Quite the contrary, whether CIGNA performed its obligations under the Agreement has no bearing on whether it harmed the Providers by providing physicians with misleading information on OCT.

Indeed, it is not even clear to us that the Agreement is a factual predicate to these claims. Theoretically, any OCT manufacturer, whether it had entered into an in-network Agreement with CIGNA or not, would be harmed by the misleading statements ostensibly made by CIGNA about the OCT technology and would have a basis for bringing claims identical to the Providers' claims here. In any event, factual connections between the Agreement and the factual underpinnings of the Complaint do not render these claims arbitrable.[9]

---

[9] Thus, the fact that the "[C]omplaint references the Agreements extensively" is of no moment. *See* Appellee's Br. at 21. The Complaint does indeed discuss the Agreement, but it hardly follows from this that the parties' "performance or interpretation" of the Agreement is implicated by the Providers' claims. *Accord Ford v. NYLCare Health Plans of*

CIGNA brings to our attention an array of circuit and district court cases where Lanham Act, tort, and trade disparagement claims were held to be arbitrable, noting that "[Lanham Act] and tort claims such as those pled in Counts V-VII are frequently referred to arbitration when they arise out of a contractual relationship." Appellee's Br. at 30. To be sure, CIGNA is correct that Lanham Act and tort claims often fall within the scope of different arbitration clauses. But that bears little relevance to whether *these* Lanham Act and tort claims fall within the scope of *this* arbitration clause. Again, the arbitrability of a given dispute depends not on the particular cause of action pleaded, but on the relationship of the arbitration clause at issue to the facts underpinning a plaintiff's claims. Hence, the cases cited by CIGNA would be relevant only if they (1) contained arbitration clauses of a similar scope to the one here, and (2) concerned claims whose underlying facts bore a similar relationship to the parties' contracts.

As the Providers note, CIGNA's cases are similar in neither respect. First, those cases concern arbitration clauses undisputedly broader than the clause at issue here. *See, e.g.*, *Sweet Dreams Unlimited*, 1 F.3d at 642-43 (assessing the scope of an arbitration clause that sweeps *beyond* the "interpretation or performance of the contract per se" and concluding that several of plaintiff's counts fall within the clause's scope despite the fact that they "do not raise issues of

---

*the Gulf Coast, Inc.,* 141 F.3d 243, 250-51 (5th Cir. 1998) (rejecting the argument that a plaintiff's decision to "referenc[e] the agreement in the factual allegations of his complaint" suggests that the action falls within the scope of an arbitration clause broader than the clause at issue here).

contract interpretation or performance"). Second, the vast majority of CIGNA's cases involve disputes that, unlike the direct claims here, clearly do relate to the performance and interpretation of the parties' contracts. *See, e.g.*, *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 724 (9th Cir. 1999) (compelling arbitration of a Lanham Act claim where "resolving Simula's factual allegations against Autoliv requires interpreting Autoliv's performance and conduct under the [parties'] Agreement"); *see also Norcom Elecs. Corp. v. CIM USA Inc.*, 104 F. Supp. 2d 198, 204 (S.D.N.Y. 2000). Thus, the cases cited by CIGNA are inapplicable.

In sum, the facts underpinning these direct claims do not concern the performance or interpretation of the parties' Agreement. Accordingly, the direct claims fall outside the scope of the Agreement's arbitration clause. The Providers may pursue these claims in court.

D.

We next address the Providers' derivative claims. Again, these claims challenge CIGNA's decision to deny OCT to the Participants and more broadly the implementation of the 2012 Policy, which barred future coverage of OCT. Through the derivative claims, the Providers seek reimbursement for the cost of the OCT services provided to the five Participants, as well as injunctive relief requiring CIGNA to reverse its policy of denying all claims for OCT. We conclude that these claims are not subject to arbitration.[10]

---

[10] In *Pascack Valley Hosp., Inc. v. Local 464 A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 400 n.7 (3d Cir. 2004), we declined to take a position on whether a health care

21

CIGNA concedes that, as non-signatories, the Participants would not be bound by the arbitration clause were they to bring the claims directly. CIGNA nonetheless maintains that allowing the Providers to pursue the Participants' ERISA claims in court would "vitiate the arbitration provision of the [Agreement]," Appellee's Br. at 27, since at the core of the Providers' dispute is simply a claim for reimbursement under the Agreement. The District Court reached the same conclusion, stating that "the arbitration provision provides the exclusive remedy for Plaintiffs' claims regarding payment for covered services" and that "Plaintiffs cannot nullify their agreements to arbitrate these claims for payment by becoming assignees of the Plan Participants' claims." *CardioNet*, 945 F. Supp. 2d at 627.

As we see it, this line of argument suffers from two independent infirmities. First, we do not agree that the

provider has standing to assert claims assigned by a patient under Section 502(a) of ERISA. We noted, however, that "almost every circuit to have considered the issue" had concluded that providers have standing, and we rejected the argument that we had previously taken a contrary view. *Id.* In the wake of *Pascack Valley*, the lower courts in this Circuit have assumed that we, like our sister circuits, permit health care providers to assert properly assigned ERISA claims on behalf of their patients. *See, e.g.*, *N. Jersey Brain & Spine Ctr. v. St. Peter's Univ. Hosp.*, 2013 WL 5366400, at *3 (D.N.J. Sept. 25, 2013). Here, unlike in *Pascack Valley*, the ability of providers to bring properly assigned ERISA claims is squarely before us. We adopt the majority position that health care providers may obtain standing to sue by assignment from a plan participant.

allegations underlying these claims concern the interpretation or performance of the Agreement. No provision in the Agreement concerns the Providers' underlying contention here that CIGNA had a duty to cover OCT. Rather, the Agreement specifically acknowledges that such determinations shall be made pursuant to "the terms or conditions of the applicable Benefit Plan" governed by ERISA. App. at 64. Therefore, interpreting the Agreement is not required, or even useful, in resolving the derivative actions. For the same reason, the allegations underpinning these claims cannot be recast as claims for failure to perform on the Agreement.

True, as CIGNA notes, the Agreement provides that CIGNA must reimburse the Providers for "Covered Services," and that "[n]o service is a Covered Service unless it is Medically Necessary." App. at 64. But this language creates *no contractual duty* on CIGNA to provide specific services to its patients, or to construe OCT as a "Covered Service." Irrespective of the reference to the terms "Covered Services" and "Medically Necessary" in the Agreement, the Providers lack the ability to bring a claim on their own behalf against CIGNA for failing to provide adequate coverage to the Participants: any such claim would be preempted by ERISA, and therefore would belong, unless and until assigned, to the participants and beneficiaries of the ERISA plan. *See Pryzbowski v. U.S. Healthcare, Inc.*, 245 F.3d 266, 278 (3d Cir. 2001) (suits against insurance companies for denial of benefits are preempted by ERISA, "even when the claim is couched in terms of common law negligence and breach of contract"); *see also Lone Star OB/GYN Assocs. v. Aetna Health Inc.*, 579 F.3d 525, 530-31 (5th Cir. 2009) (explaining that "any determination of benefits under the

23

terms of a plan—i.e., what is 'medically necessary' or a 'Covered Service'—[] fall[s] within ERISA" and would be preempted). This is not an instance where a plaintiff sidesteps an identical contractual right in an attempt to sidestep an otherwise-applicable arbitration clause. Rather, claims challenging the denial of service may be brought *only* outside the confines of the Agreement, through ERISA claims assigned by CIGNA patients. The claims clearly do not concern the performance and interpretation of the Agreement.

As the Providers correctly note, CIGNA's argument to the contrary rests on a conflation of claims, such as this one, seeking *coverage* under a benefit plan, and claims seeking *reimbursement* for coverage provided. The distinction is key. As we explained in *Pascack Valley*, a provider may bring a contract action for an insurer's failure to reimburse the provider pursuant to the terms of the agreement, while a claim seeking coverage of a service may only be brought under ERISA. 388 F.3d at 403-04 (holding that a hospital had an independent breach of contract action against the insurer because "the dispute here is not over the *right* to payment, which might be said to depend on the patients' assignments to the Providers, but the *amount,* or level, of payment, which depends on the terms of the provider agreements" (emphasis in original; quotation marks and alterations omitted)); *see also Blue Cross of Cal. v. Anesthesia Care Assocs. Med. Grp., Inc.*, 187 F.3d 1045, 1051 (9th Cir. 1999) (providers' claim not preempted by ERISA where they "arise from [insurer's] alleged breach of the provider agreements' provisions regarding fee schedules, and the procedure for setting them, not what charges are 'covered' under the [] Plan"). Here, the Providers' claims do not concern the amount of payment to which they are entitled under the

24

Agreement, but the right to payment under the terms of the relevant plans. Thus, we reject the argument that claims "substantively identical" to these would fall within the scope of the arbitration clause. *Cf. CardioNet, Inc.*, 945 F. Supp. 2d at 627.

Second, even if these claims would fall within the arbitration clause if brought directly, it does not follow that these claims when brought derivatively on behalf of others would necessarily fall within the arbitration clause. Stated differently, we fail to see how bringing an assignee's claim derivatively nullifies an assignor's promise to bring its own direct claim through arbitration—at least where, as here, the Agreement does not explicitly require the arbitration of assigned claims.

It is a basic principle of assignment law that an assignee's rights derive from the assignor. That is, "an assignee of a contract occupies the *same legal position* under a contract as did the original contracting party, he or she can acquire through the assignment *no more and no fewer rights* than the assignor had, and cannot recover under the assignment any more than the assignor could recover." 6A C.J.S. *Assignments* § 110 (footnotes omitted) (emphasis added). Thus, assuming the validity of the Participants' assignments to the Providers, CardioNet and LifeWatch now stand in the shoes of the Participants, and have "standing *to assert whatever rights the assignor[s] possessed*." *Misic v. Bldg. Serv. Emp. Health & Welfare Trust*, 789 F.2d 1374, 1378 n.4 (9th Cir. 1986) (emphasis added).

Here, it is undisputed that the Participants possess the right to pursue their ERISA claims in court, rather than

25

through mandatory arbitration. That right does not dissipate simply because the claim is brought by assignees who have promised to arbitrate certain *direct* claims they might bring against the defendant. *Cf. Conn. State Dental Assoc. v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1347 (11th Cir. 2009) ("[A] provider that has received an assignment of benefits and has a[n independent] state law claim . . . holds *two separate claims*." (emphasis added)). Surely, where an assignor has agreed to arbitrate its claims with a defendant, the assignor cannot circumvent the arbitration clause by assigning her claim to an assignee whose contract with the defendant contains no such clause. Just as the burden of arbitration must travel with a claim, so too, must the right to litigate.

Moreover, we have concerns about the policy implications of forcing a provider to arbitrate participants' claims against an insurer. CIGNA proposes that compelling arbitration of such claims when brought derivatively by a provider does not diminish the substantive rights of participants, since "they are free to pursue such claims directly in federal court." Appellee's Br. at 29. But this contention trivializes the important public policy interests served by permitting providers to bring such claims on behalf of plan participants. As the Fifth Circuit has observed, the assignment of ERISA claims to providers serves the interests of patients by increasing their access to care:

> Many providers seek assignments of benefits to avoid billing the beneficiary directly and upsetting his finances and to reduce the risk of non-payment. If their status as assignees does not entitle them to federal standing against the

plan, providers would either have to rely on the beneficiary to maintain an ERISA suit, or they would have to sue the beneficiary. Either alternative, indirect and uncertain as they are, would discourage providers from becoming assignees and possibly from helping beneficiaries who were unable to pay them "up-front." The providers are better situated and financed to pursue an action for benefits owed for their services.

*Hermann Hosp. v. MEBA Med. & Benefit Plan*, 845 F.2d 1286, 1289 n.13 (5th Cir. 1988), abrogated on other grounds by *Access Mediquip, L.C.C. v. UnitedHealthcare Ins. Co.*, 698 F.3d 229 (5th Cir. 2012). Were we to prevent providers that have promised to arbitrate their own claims against an insurer from bringing patients' claims in court, these providers would be less likely to accept patients' claims in exchange for services. This, in turn, would make it more difficult for patients to receive necessary services where their insurers have denied coverage.

Accordingly, even if these claims would be arbitrable if brought directly by the Providers, we would not force the Providers to arbitrate the claims derivatively—at least, absent a clear statement in that Agreement intimating that the parties intended to arbitrate such claims.

## III.

For the foregoing reasons, we hold that the Providers' direct and derivative claims fall outside the scope of the Agreement's arbitration clause. Accordingly, we vacate the

27

order of the District Court and remand for further proceedings in accordance with this Opinion.

# Appendix A

6.3     <u>Internal Dispute Resolution</u>.     Disputes that might arise between the parties regarding the performance or interpretation of the Agreement must first be resolved through the applicable internal dispute resolution process outlined in the Administrative Guidelines. In the event the dispute is not resolved through that process, either party can request in writing that the parties attempt in good faith to resolve the dispute promptly by negotiation between designated representatives of the parties who have authority to settle the dispute. If the matter is not resolved within 60 days of such a request, either party may initiate arbitration by providing written notice to the other. With respect to a payment or termination dispute, Provider must submit a request for arbitration within 12 months of the date of the letter communicating the final decision under CIGNA's internal dispute resolution process unless applicable law specifically requires a longer time period to request arbitration. If arbitration is not requested within that 12 month period, CIGNA's final decision under its internal dispute resolution process will be binding on Provider, and Provider shall not bill CIGNA, Payor or the Participant for any payment denied because of the failure to timely submit a request for arbitration.

6.4     <u>Arbitration</u>. If the dispute is not resolved through CIGNA's internal dispute resolution process, either party can initiate arbitration by providing written notice to the other. If one of the parties initiates arbitration, the proceeding will be held in the jurisdiction of Provider's domicile. The parties will jointly appoint a mutually acceptable arbitrator. If the parties are unable to agree upon such an arbitrator within 30 days after one of the parties has notified the other of the desire to submit a dispute for arbitration, then the parties will prepare a Request for a Dispute Resolution List and submit it to the American Health Lawyers Association Alternative Dispute

29

Resolution Service (AHLA ADR Service) along with the appropriate administration fee. Under the Codes of Ethics and Rules of Procedure developed by the AHLA ADR Service, the parties will be sent a list of 10 arbitrators along with a background and experience description, references and fee schedule for each. The 10 will be chosen by the AHLA ADR Service on the basis of their experience in the area of the dispute, geographic location and other criteria as indicated on the request form. The parties will review the qualifications of the 10 suggested arbitrators and rank them in order of preference from 1 to 9. Each party has the right to strike 1 of the names from the list. The person with the lowest total will be appointed to resolve the case. Each party will assume its own costs, but the compensation and expenses of the arbitrator and any administrative fees or costs will be borne equally by the parties, subject to any limitation on fees or costs required under the MDL No. 1334 Settlement Agreement Among CIGNA HealthCare and Healthcare Providers during the period of time such requirements are in effect. Arbitration is the exclusive remedy for the resolution of disputes under this Agreement. The decision of the arbitrator will be final, conclusive and binding, and no action at law or in equity may be instituted by CIGNA or Provider other than to enforce the award of the arbitrator. The parties intend this alternative dispute resolution procedure to be a private undertaking and agree that an arbitration conducted under this provision will not be consolidated with an arbitration involving other physicians or third parties, and that the arbitrator will be without power to conduct an arbitration on a class basis. Judgment upon the award rendered by the arbitrator may be entered in any court of competent jurisdiction.