**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1663
_____

AMERICAN ORTHOPEDIC & SPORTS MEDICINE,
on assignment of Joshua S.,
Appellant

v.

INDEPENDENCE BLUE CROSS BLUE SHIELD;
HORIZON BLUE CROSS BLUE SHIELD OF
NEW JERSEY
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.N.J. No. 2-16-cv-08988)
Honorable Jose L. Linares, U.S. District Judge
_____

Argued: November 15, 2017

Before: AMBRO, KRAUSE, and RENDELL, *Circuit Judges*

(Opinion Filed: May 16, 2018)

Samuel S. Saltman  [Argued]
Callagy Law
650 From Road
Suite 565
Paramus, NJ 07652
    *Counsel for Appellant*


Susan M. Danielski  [Argued]
Gerald J. Dugan
Dugan Brinkmann Maginnis & Pace
1880 John F. Kennedy Boulevard
Suite 1400
Philadelphia, PA 19103
    *Counsel for Appellee Independence Blue Cross
    Blue Shield*


Michael E. Holzapfel  [Argued]
Becker LLC
354 Eisenhower Parkway
Plaza II, Suite 1500
Livingston, NJ 07039
    *Counsel for Appellee Horizon Blue Cross
    Blue Shield of New Jersey*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

With the evolution of managed healthcare and the advent of provider networks and other cost-control mechanisms, many insurers in recent years have incorporated into their health insurance plans clauses that purport to bar insureds from assigning their claims to any third party—even the healthcare provider that rendered the service. This appeal presents the question whether such "anti-assignment clauses" are enforceable, or whether, as argued by the healthcare provider in this case whose claim was dismissed for lack of standing, they are antithetical to the Employee Retirement Income Security Act ("ERISA") and to public policy. For the reasons that follow, we conclude that anti-assignment clauses in ERISA-governed health insurance plans are enforceable, and we will therefore affirm the judgment of the District Court.

I.      **Factual and Procedural History**

In October 2015, Appellant American Orthopedic and Sports Medicine performed shoulder surgery on "Joshua," a patient who was covered by a health insurance plan issued by Appellees (the "Insurers").[1]

_____

[1] The Insurers are Independence Blue Cross Blue Shield and Horizon Blue Cross Blue Shield of New Jersey, both of which are licensees of the Blue Cross Blue Shield

3

After the surgery, Appellant charged Joshua for the procedure. Because Appellant did not participate in the Insurers' network, it was not limited to the fee schedule prescribed by the Insurers. Instead, it charged Joshua a total of $58,400 and submitted a claim in that amount to the Insurers on Joshua's behalf. The claim form identified the various medical services rendered to Joshua and indicated that he had "authorize[d] payment of medical benefits" to Appellant. J.A. 38. As Appellant's charges far exceeded the plan's allowed reimbursement, the Insurers responded by processing Joshua's claim according to its out-of-network cap of $2,633, applying his deductible of $2,000 and his 50% coinsurance of $316, issuing him a small reimbursement check for the remaining $316, and informing him that he would still owe Appellant the remaining $58,083.

Dissatisfied, Appellant appealed its claim through the Insurers' internal administrative process. At the same time, it arranged for Joshua to sign a document entitled "Assignment of Benefits & Ltd. Power of Attorney," which reflected that Joshua was assigning to Appellant his right to pursue claims under his health insurance plan for the surgery and, in the alternative, that he granted to Appellant a limited power of attorney to recover the payment on his behalf through an arbitration or lawsuit. J.A. 36. After the Insurers apparently denied the appeal, Appellant sued them in New Jersey state court for violations of ERISA and its implementing regulations, and for breach of contract. At that point, the

Association. Joshua's plan was issued by an Independence affiliate, but Appellant initially submitted its reimbursement claim to Independence via Horizon.

4

Insurers removed the suit to federal court and moved to dismiss, pointing out that Joshua's insurance plan included an anti-assignment clause that stated, "[t]he right of a Member to receive benefit payments under this Program is personal to the Member and *is not assignable* in whole or in part to any person, Hospital, or other entity," Independence Response to Court Letter *90 (filed Nov. 10, 2017) (emphasis added),[2] and arguing that Appellant therefore lacked standing to sue. The District Court agreed and dismissed Appellant's complaint, and this appeal followed.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a District Court's decision to dismiss for lack of standing. *Leuthner v. Blue Cross & Blue Shield of Ne. Pa.*, 454 F.3d 120, 124 (3d Cir. 2006). To the extent that the Insurers "contest[] the sufficiency of the

---

[2] In full, the anti-assignment clause read:

Assignment of Benefit to Providers
The right of a Member to receive benefit payments under this Program is personal to the Member and is not assignable in whole or in part to any person, Hospital, or other entity nor may benefits of this Program be transferred, either before or after Covered Services are rendered.   However, a Member can assign benefit payments to the custodial parent of a Dependent covered under this Program, as required by law.

5

pleadings," we "only consider the allegations of the complaint and documents referenced therein" and we do so "in the light most favorable to the plaintiff." *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012) (quoting *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000)).

## III. Discussion

Appellant contends it has standing to sue here, first, because anti-assignment clauses in ERISA-governed health insurance contracts are unenforceable against healthcare providers and, second, because even if those clauses are enforceable, the Insurers waived their right to enforce it in this case. If we conclude the anti-assignment clause here is enforceable against healthcare providers, Appellant raises a third argument in the alternative, i.e., that we should remand to allow it an opportunity to correct the deficiencies in Joshua's Power of Attorney and pursue Joshua's claims on his behalf in an agency capacity. We address these arguments in turn.

### A. *Enforceability of Anti-Assignment Clauses*

The parties stake out opposing views on the enforceability of anti-assignment clauses, grounding their positions in ERISA's text, congressional policy, and persuasive authority from other Courts of Appeals. For the reasons explained below, we conclude that none justify a departure from the general rule that courts will enforce the terms of an agreement that was freely negotiated between contracting parties.

6

ERISA is a "comprehensive legislative scheme" designed to "protect . . . the interests of participants in employee benefit plans and their beneficiaries," *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (internal quotation marks omitted), and to do so provides for a variety of standards and regulations for both "pension plans" and "welfare plans," 29 U.S.C. § 1002(1), (2); *see also N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 650-51 (1995). The latter category includes health insurance plans, 29 U.S.C. § 1002(1), and ERISA provides employees covered by such plans with the right to sue to "recover benefits due . . . under the terms of [the] plan," *id.* § 1132(a)(1)(B). That right, however, is limited to the "participant" or "beneficiary" under the plan, *id.* § 1132(a)(1), with those terms limited respectively to employees, current or former, eligible to receive benefits under a covered plan, *id.* § 1002(7), and to persons designated by a participant or the terms of the plan to receive some benefit from the plan, *id.* § 1002(8).[3] Although a healthcare

---

[3] In full, ERISA defines a "participant" as:

[A]ny employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

provider does not fall into either category, *see Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 400 (3d Cir. 2004), we held in *North Jersey Brain & Spine Center v. Aetna, Inc.*, 801 F.3d 369 (3d Cir. 2015) (hereinafter "*NJBSC*"), that a valid assignment of benefits by a plan participant or beneficiary transfers to such a provider both the insured's right to payment under a plan and his right to sue for that payment, *id.* at 372.

Appellant argues that because we interpreted ERISA in *NJBSC* to allow for the assignment of benefits, we should now hold that such assignments also may not be disallowed. But in *NJBSC* we merely held—in the absence of an anti-assignment clause—that "when a patient assigns payment of insurance benefits to a healthcare provider, [the] provider gains standing to sue for that payment." *Id*. We had no occasion to address the effect or enforceability of an anti-assignment clause, and thus, despite Appellant's heavy reliance on that case, it has little bearing here.

The Insurers, on the other hand, posit that if Congress had intended to prohibit anti-assignment clauses in ERISA-governed health insurance plans, it would have done so explicitly, just as it did in the pension plan context.[4]   And,

_____

29 U.S.C. § 1002(7).  And ERISA defines a "beneficiary" as: "[A] person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." *Id.* § 1002(8).

[4] ERISA states that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated."  29 U.S.C. § 1056(d)(1).

8

notably, as anti-assignment clauses have become an increasingly prominent feature of health insurance contracts in more recent years, Congress also has had ample opportunity to mandate assignability if indeed that were its intent. Yet despite repeated amendments and a largescale overhaul of the healthcare system via the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), it has not done so.

In addition, the Insurers highlight the Supreme Court's observation in *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825 (1988), that "[Congress] had before it a provision to bar the alienation . . . of ERISA plan benefits, and chose to impose that limitation only with respect to ERISA pension benefit plans, and *not* ERISA welfare benefit plans. In a comprehensive regulatory scheme like ERISA, such omissions are significant ones." *Id.* at 837. Some Courts of Appeals have concluded, based in part on that language from *Mackey*, that Congress' silence on assignability of welfare benefits means anti-assignment clauses in the health insurance context must be enforceable. *See, e.g.*, *Davidowitz v. Delta Dental Plan of Cal., Inc.*, 946 F.2d 1476, 1480-81 (9th Cir. 1991) ("Congress carefully considered assignment of both pension and welfare plan benefits, and consciously decided to prohibit pension plan assignments but remain silent on welfare benefits . . . . Congress intended *not* to mandate assignability."); *Ark. Blue Cross & Blue Shield v. St. Mary's Hosp., Inc.*, 947 F.2d 1341, 1349 (8th Cir. 1991) ("If Congress intended that a mandatory rule govern the assignment of welfare benefits, it could have easily provided for such a rule, as it did in the case of pension benefits.").

We find *Mackey* less instructive than our Sister Circuits. The absence of statutory language prohibiting assignment in the welfare context may indicate that Congress intended to preserve the rights of individual plan beneficiaries to assign their benefits. But that silence does not necessarily mean Congress intended to permit plan trustees to extinguish those rights for all beneficiaries through a blanket contractual waiver. In fact, two considerations point the other way. First, the Supreme Court in *Mackey* emphasized that Congress' intent in "bar[ring] the alienation" of pension benefits was to protect pensioners. 486 U.S. at 837. Yet while prohibiting assignment in the pension context "ensure[s] that the employee's accrued benefits are actually available for retirement purposes," H.R. Rep. No. 93-807, at 68 (1974), prohibiting assignment in the health insurance context, as Appellant argues, could disadvantage patients with shorter-term needs, limit patient choices, and eventually reduce out-of-network providers' market share. Second, unlike in the pension context, assignment of plan benefits has been "fairly ubiquitous" in the health insurance context—particularly assignment of claims to the service provider that performed the service for which the claim is being submitted. Gregory F. Jacob, *Provider "Standing" Wars Continue*, 24 No. 3 ERISA Litig. Rep., Sept. 2016, at 4. Thus, Congress may have intended a continuation of the status quo and simply perceived no need to state expressly that insureds retained a right to assign their benefits to their service providers.

In short, the text of ERISA, even with the interpretations in *NJBSC* and *Mackey*, is inconclusive on the question we address today.

10

ii.     Congressional Policy

Because ERISA does not clearly prohibit anti-assignment clauses, we confront a statutory gap yet to be filled. And when it comes to ERISA, "it is well settled that Congress intended that the federal courts would fill in [such] gaps by developing, in light of reason, experience, and common sense, a federal common law of rights and obligations imposed by the statute." *Teamsters Pension Tr. Fund of Phila. & Vicinity v. Littlejohn*, 155 F.3d 206, 208 (3d Cir. 1998) (citing *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996)). To do so, we "look to the provisions of the whole law, and to its object and policy." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51 (1987) (quoting *Kelly v. Robinson*, 479 U.S. 36, 43 (1986)). As relevant here, Congress has explained that "the policy of [ERISA is] to protect . . . the interests of participants in employee benefit plans," 29 U.S.C. § 1001(b), and we have previously observed that participants' interests are served by "increasing their access to care," *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 179 (3d Cir. 2014); *cf. IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986) ("Courts have indicated that because ERISA" is a "remedial statute[]" it "should be liberally construed in favor of protecting the participants in employee benefit plans." (citations omitted)).

With those interests in mind, the parties each urge that plausible policy considerations support their respective positions. Appellant construes "access to care" narrowly, focusing on whether individual patients' choices are limited, and arguing that enforcing anti-assignment clauses creates incentives for providers not to serve out-of-network patients with such clauses in their plans because providers will have no remedy for nonpayment other than to sue patients—a

11

proposition that is both expensive and bad for business. And eventually, Appellant asserts, the widespread use of anti-assignment clauses will drive out-of-network providers out of business entirely, reducing the choices available to patients. That is because instead of being able to recover directly from the insurer, out-of-network providers will be forced to rely on the patient to recover from that insurer before seeking payment, in turn, from the patient, with each step along the way adding to the risk of default. Just as we held that "escape clauses"[5] in ERISA-governed plans were unenforceable because they violated the policies underlying ERISA, *Ne. Dep't ILGWU Health & Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund*, 764 F.2d 147, 164 (3d Cir. 1985), so too, Appellant urges, we should conclude these negative policy consequences invalidate anti-assignment clauses.[6]

---

[5] "Escape clauses" are provisions "through which [a] plan attempts to escape all liability if a participant or beneficiary is covered by another plan, regardless of the level of benefits provided by the other plan." *Ne. Dep't ILGWU Health & Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund*, 764 F.2d 147, 149-50 (3d Cir. 1985).

[6] Appellant separately argues that anti-assignment clauses reduce patient access to care because they allow insurers to "easily circumvent . . . assignments by burying an anti-assignment in a voluminous healthcare plan" that neither the patient nor the healthcare provider is likely to read in its entirety. Appellant's Br. 13. But the mere potential for abuse is not a reason to hold anti-assignment clauses categorically unenforceable, particularly given the availability of traditional contract defenses, such as fraud, misrepresentation, and

The Insurers, on the other hand, contend that anti-assignment clauses further Congress' related but broader goal in ERISA of "maintaining premium costs at a reasonable level," Horizon Br. 27 (citing *Klund v. High Tech. Sols., Inc.*, 417 F. Supp. 2d 1155, 1159 (S.D. Cal. 2005)), and in the process, of making health insurance, and ultimately healthcare itself, more accessible to patients. That is because larger insurance networks can use their market power to cap the amount that healthcare providers can charge for their services, and anti-assignment clauses strengthen those networks by encouraging providers to join and by protecting insurers from exorbitant demands for reimbursement—a proposition accepted by a variety of federal and state courts.[7]

unconscionability. *See, e.g.*, *Nw. Nat'l Ins. Co. v. Donovan*, 916 F.2d 372, 377 (7th Cir. 1990) ("If a clause really is buried in illegible 'fine print'—or if . . . it plainly is neither intended nor likely to be read by the other party—this circumstance may support an inference of fraud."). And here, in any event, there was no burying: The anti-assignment provision appears on the "Introduction" page of the contract.

[7] Despite the facial appeal of the argument that anti-assignment clauses help control the rates charged by out-of-network providers, there is room for skepticism, as most insurance plans already cap out-of-network reimbursement, with the plan here a case in point: Although the Insurers make much of Appellant charging $58,400 for a procedure that they reimburse at only $2,633, describing it as "unconstrained" and "a proverbial 'fox running the henhouse' scenario," Horizon Br. 34, the Insurers fail to show how assignment of the claim would expose them to additional liability beyond the $2,633 cap.

*See, e.g.*, *St. Mary's*, 947 F.2d at 1348; *Somerset Orthopedic Assocs., P.A. v. Horizon Blue Cross & Blue Shield of N.J.*, 785 A.2d 457, 463-64 (N.J. Super. Ct. App. Div. 2001).

Yet the parties' respective policy arguments are only as persuasive as the empirical data that support them, and neither party cites to authoritative empirical data. Instead, they would have us deduce whether anti-assignment clauses promote or impede the goals of ERISA on the basis of their dueling economic arguments and without pointing us to any congressional findings or hearings on the subject. This we decline to do, respecting that Congress is far better positioned to gather data, solicit and respond to the views of its constituents, and craft a solution that takes such policy considerations into account. Thus, "[w]here a legislature has significantly greater institutional expertise . . . the Court in practice defers to empirical legislative judgments," *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 402 (2000) (Breyer, J., concurring).

As the parties' policy arguments do little to tip the scales, we turn to the out-of-Circuit authority on which they rely.

### iii.    The Other Courts of Appeals

Although neither ERISA's text nor policy point decidedly in one direction, persuasive authority from our Sister Circuits does. In thoughtful and reasoned decisions, every Circuit to have considered the arguments presented by Appellant has rejected them, ultimately concluding that nothing in ERISA forecloses plan administrators from freely negotiating anti-assignment clauses, among other terms. *See*

14

*McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.*, 857 F.3d 141, 147 (2d Cir. 2017); *Physicians Multispeciality Grp. v. Health Care Plan of Horton Homes, Inc.*, 371 F.3d 1291, 1295-96 (11th Cir. 2004); *LeTourneau Lifelike Orthotics & Prosthetics, Inc. v. Wal-Mart Stores*, 298 F.3d 348, 352 (5th Cir. 2002); *City of Hope Nat'l Med. Ctr. v. HealthPlus, Inc.*, 156 F.3d 223, 228-29 (1st Cir. 1998); *St. Francis Reg'l Med. Ctr. v. Blue Cross & Blue Shield of Kan., Inc.*, 49 F.3d 1460, 1465 (10th Cir. 1995); *Davidowitz*, 946 F.2d at 1479-81.

As purportedly contrary authority, Appellant directs us to *Hermann Hospital v. MEBA Medical & Benefits Plan*, 959 F.2d 569 (5th Cir. 1992), where the Fifth Circuit interpreted an anti-assignment clause "as applying only to unrelated, third-party assignees—other than the health care provider of assigned benefits" because it read that particular anti-assignment clause as "clearly intended to prevent . . . assignment of payments under the Plan to . . . creditors . . . which have no relationship to the providing of covered benefits." *Id.* at 575. But in a subsequent decision, the court clarified that it had declined to enforce the anti-assignment clause in *Hermann* only because the clause there did not, by its terms, cover healthcare providers and, consistent with the other Courts of Appeals, it viewed explicit anti-assignment clauses as enforceable. *LeTourneau*, 298 F.3d at 351-52.

In sum, we perceive no compelling reason to stray from the "black-letter law that the terms of an unambiguous private contract must be enforced." *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 150 (2009); *see also In re Kaplan*, 143 F.3d 807, 818 (3d Cir. 1998) ("Parties are entitled to enforce the terms of negotiated contracts[.]" (quoting *RTC v.*

15

*Holtzman*, 618 N.E.2d 418, 424 (Ill. 1993))). We are left with a gap in the text, reasonable and competing policy arguments that lack grounding in legislative fact finding, and an overwhelming consensus among the Courts of Appeals that "ERISA leaves the assignability or non-assignability of health care benefits under ERISA-regulated welfare plans to the negotiations of the contracting parties." *City of Hope*, 156 F.3d at 229. We now join that consensus and hold that anti-assignment clauses in ERISA-governed health insurance plans as a general matter are enforceable.

> *B.     Waiver*

Even assuming that an anti-assignment clause is generally enforceable, Appellant argues that the Insurers waived their right to enforce it because they accepted and processed the claim form, issued a check to Joshua, and failed to raise the anti-assignment clause as an affirmative defense during the internal administrative appeals process. We are not persuaded.

Under applicable state law,[8] a waiver requires a "clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it," *Brown v. City of Pittsburgh*, 186 A.2d 399, 401 (Pa. 1962), and routine processing of a claim form, issuing payment at the out-of-network rate, and summarily denying the informal appeal do

---

[8] Although Appellant initially argued on appeal that we should apply New Jersey law, as opposed to Pennsylvania law, it has since acknowledged that Joshua's insurance plan included an unambiguous Pennsylvania choice-of-law provision.

not demonstrate "an evident purpose to surrender" an objection to a provider's standing in a federal lawsuit, *see, e.g.*, *Emami v. Quinteles IMS*, No. 17-3069, 2017 WL 4220329, at \*3 (D.N.J. Sept. 21, 2017) (holding that "dealing directly with the [m]edical [p]rovider in the claim review process[] or . . . directly remitting payment to the [m]edical [p]rovider" did not constitute a waiver); *Shah v. Blue Cross Blue Shield of Ala.*, No. 17-700, 2017 WL 4182043, at \*3 (D.N.J. Sept. 21, 2017) (stating that "direct payment to a patient or healthcare provider does not constitute waiver of an anti-assignment provision where the plan at issue authorizes such payment"); *Cohen v. Indep. Blue Cross*, 820 F. Supp. 2d 594, 606-07 (D.N.J. 2011) (holding that allegations that an insurer made direct payments to an insured and ignored a healthcare provider's appeal did not constitute a waiver). *See* J.A. 58 (indicating that Outpatient Ambulatory Surgical Center services are reimbursed to out-of-network providers at 50%, after deductible); J.A. 36, 40.

### C. Power of Attorney

If we reach this point in our analysis, Appellant has requested that we nonetheless vacate and remand so that it can perfect an alternative basis for standing: the power of attorney that it acknowledges was deficient under applicable state law. Appellant Suppl. Letter Br. 1 (Nov. 7, 2017); *see also* Oral Arg. at 8:30 ("[T]he technical requirements are not there.").[9] The Insurers, for their part, argue that remand

---

[9] Although Joshua's health insurance plan contained a Pennsylvania choice-of-law provision that governed the interpretation and application of the plan's anti-assignment clause, *see supra* note 8, that provision does not address the

17

would be futile because "[a]n anti-assignment clause encompasses and applies to a limited power-of-attorney . . . just as forcefully as it applies to a general 'assignment,'" Horizon Suppl. Letter Br. 1 (Nov. 7, 2017), and because "there is no appreciable distinction between" assignments and powers of attorney, *id.* at 3.

The Insurers are mistaken. Assignments and powers of attorney differ in important respects with distinct consequences for the power of a plan trustee to contractually bind an insured. An assignment purports to transfer ownership of a claim to the assignee, giving it standing to assert those rights and to sue on its own behalf. *See Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 271 (2008). Thus, a plan trustee can limit the ability of a beneficiary to assign claims because, among the parties' "power to limit the rights created by their agreement," Restatement (Second) of Contracts § 322 cmt. a (1981), is the power to restrict ownership interest to particular holders. A power of attorney, on the other hand, "does not transfer an ownership interest in the claim," *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 108 (2d Cir. 2008), but simply confers on the agent the authority to act "on behalf

choice-of-law applicable to a power of attorney. But we have no need to resolve whether Pennsylvania or New Jersey law is applicable because Appellant's power of attorney failed the requirement of both laws that there be at least one witness. *See* 20 Pa. Cons. Stat. Ann. § 5601(b); N.J. Stat. Ann. §§ 46:2B-8.9, 46:14-2.1(b); *see generally Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 229-30 (3d Cir. 2007) (noting that choice-of-law analysis is unnecessary where the laws at issue do not conflict).

of the principal," *In re Complaint of Bankers Tr. Co.*, 752 F.2d 874, 881 (3d Cir. 1984).

As these principles apply here, our holding today that the anti-assignment clause is enforceable means that Joshua, as plan beneficiary, did not transfer the interest in his claim, but it does not mean that Joshua cannot grant a valid power of attorney. To the contrary, because he retains ownership of his claim, Joshua, as principal, may confer on his agent the authority to assert that claim on his behalf, and the anti-assignment clause no more has power to strip Appellant of its ability to act as Joshua's agent than it does to strip Joshua of his own interest in his claim. *See Titus v. Wallick*, 306 U.S. 282, 289-90 (1939) (noting that a power of attorney did not "operate as an assignment to vest the attorney with such title or interest as will enable him to maintain the suit in his own name"); *W.R. Huff*, 549 F.3d at 108 (concluding that "a mere power-of-attorney . . . does not confer standing to sue in the holder's own right," whereas "an assignment of claims transfers legal title or ownership of those claims and thus fulfills the constitutional requirement of an 'injury-in-fact'"). Indeed, the Insurers' argument that anti-assignment clauses preclude principals from granting a power of attorney to their agents not only lacks support; it also seems particularly ill-suited for the healthcare context where patients must rely on their agents when they anticipate even short-term incapacitation after medical procedures, *see Powers v. Fultz*, 404 F.2d 50, 51 (7th Cir. 1968), and where those who anticipate longer-term unavailability, like deployed service members or those suffering from progressive conditions, depend on their designated agents to handle their medical claims and other affairs in their absence, *see, e.g.*, *Bartholomew v. Blevins*, 679 F.3d 497, 499 (6th Cir. 2012)

19

(deployed service members); *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384 (7th Cir. 2010) (incompetent persons).

Accordingly, we reject the Insurers' contention that the presence here of a valid anti-assignment clause renders futile any remand for Appellant to perfect its power of attorney. Nonetheless, we decline to remand for a different reason: Appellant waived its arguments concerning the power of attorney by failing to raise them in its opening or reply brief and, indeed, did not address the significance of the power of attorney until we invited it to do so in supplemental briefing. *See United States v. Quillen*, 335 F.3d 219, 224 (3d Cir. 2003).

\* \* \*

In sum, anti-assignment clauses in ERISA-governed health insurance plans are generally enforceable, the Insurers did not waive their objections to Appellant's standing, and Appellant, having waived its argument for a remand to perfect the power of attorney, concedes that the power of attorney in this record is invalid under state law. For those reasons, the District Court correctly held that Appellant lacked standing to proceed in federal court, and we will affirm the District Court's judgment of dismissal.