**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-3381
_____

THE PLASTIC SURGERY CENTER, P.A.,
                                        Appellant

v.

AETNA LIFE INSURANCE COMPANY

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-17-cv-13467)
District Judge: Honorable Freda L. Wolfson

_____

No. 18-3556

THE PLASTIC SURGERY CENTER, P.A.,
                                        Appellant

v.

AETNA HEALTH INC

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-18-cv-00503)
District Judge: Honorable Freda L. Wolfson

_____

Argued September 19, 2019

Before: KRAUSE, MATEY, *Circuit Judges*, and
QUIÑONES ALEJANDRO,[*] *District Judge*

(Filed: July 17, 2020)


Michael M. DiCicco    **[ARGUED]**
James A. Maggs
Maggs & McDermott
3349 Highway 138
Building C, Suite D
Wall, NJ 07719

　　*Counsel for Appellant, The Plastic Surgery Center, P.A.*

Colin J. O'Boyle     **[ARGUED]**
Gregory S. Voshell
Elliott Greenleaf
925 Harvest Drive
Suite 300
Blue Bell, PA 19422

---

　　[*] Honorable Nitza I. Quiñones Alejandro, District Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

*Counsel for Appellees Aetna Life Insurance Co, Aetna Health Inc.*

_____

**OPINION OF THE COURT**
_____

KRAUSE, *Circuit Judge*.

This case presents an issue of first impression for this Circuit and of great importance to the healthcare industry: What remedies are available to an out-of-network healthcare provider when an insurer agrees to pay for the provision of services that are not otherwise available in-network and then reneges on that promise?  To frame the question in statutory terms, in what circumstances does section 514(a) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.*, which preempts state laws that "relate to" ERISA plans, preempt an out-of-network provider from pursuing common law breach of contract, promissory estoppel, and unjust enrichment claims?  The District Court held the provider's claims here were preempted.  We disagree as to the breach of contract and promissory estoppel claims, so we will affirm, in part, and reverse, in part.

3

## I.    BACKGROUND[1]

Aetna[2] is an insurer for healthcare plans offered by various employers.  Employees of two of those employers—J.L. and D.W.—had plans that did not authorize coverage of out-of-network services under normal circumstances: J.L.'s plan provided out-of-network benefits only in cases of "Urgent Care or a medical Emergency,"[3] JA 239, and the procedure J.L.

---

[1] We draw this background from the allegations in the Center's first amended complaint in J.L.'s case and proposed second amended complaint in D.W.'s case, which we accept as true at the motion to dismiss stage. *See Menkes v. Prudential Ins. Co. of Am.*, 762 F.3d 285, 287 (3d Cir. 2014).

[2] Aetna Health Inc. and Aetna Life Insurance Company are J.L.'s and D.W.'s plan administrators, respectively.  We refer to them collectively as Aetna, the insureds' plan administrator, or the insurer.

[3] "Urgent Care" and "Emergency" are defined terms in J.L.'s plan.  Emergency is defined as:

A medical condition manifesting itself by acute symptoms of sufficient severity including, but not limited to, severe pain, psychiatric disturbances and/or symptoms of Substance Abuse such that a prudent layperson, who possesses an average knowledge of health and medicine, could expect the absence of immediate medical attention to result in: placing the health of the individual . . . in serious jeopardy; serious impairment to bodily functions; or serious dysfunction of a bodily organ or part.

4

required fell into neither category, and D.W.'s plan did not provide out-of-network benefits at all.

As it turned out, however, both J.L. and D.W. required medical procedures that were not available in-network. J.L. needed bilateral breast reconstruction surgery following a double mastectomy, and there were no in-network physicians available to perform the procedure. D.W. required facial reanimation surgery—a niche procedure performed by only a handful of surgeons in the United States. Both insureds were therefore referred for treatment to the Plastic Surgery Center, a New Jersey medical practice specializing in plastic and reconstructive surgery. As an out-of-network provider, however, the Center was concerned about how it would be compensated, so before agreeing to provide care, the Center contacted Aetna to confirm that it would make payment.

Aetna agreed. In J.L.'s case, "Aetna contracted with [the Center] to provide multi-stage breast reconstruction surgery to J.L., along with related medical services, and to pay [the Center] a reasonable amount for those services according to the terms of the Plan." JA 201–02. This agreement was struck during telephone conversations between Aetna and Center employees. In D.W.'s case, as documented in various contemporaneous notes, a Center employee initially asked Aetna for a one-off "single case agreement" with a negotiated rate of payment, but reported back: "(Aetna is stating they

---

JA 223. Urgent Care is "[c]are for a non-life threatening condition that requires care by a Provider within 24 hours." JA 231.

5

don't neg an[y][4] longer it would be paid at the highest in[-]network level) however I will still attempt to get approval for neg payment based on no available providers." JA 65, 67 (capitalization altered). The notes next reflect that an Aetna employee called the Center back to confirm that Aetna "agreed to approve and pay for" D.W.'s surgery and to provide payment at the "highest in[-]network level." JA 59. Pursuant to these alleged oral agreements that "[the Center] and Aetna entered" in each case, the Center then provided the specified services "[i]n exchange for," respectively, payment of a "reasonable amount" and at the "highest in[-]network level" under the plans. JA 60, 204.

Once the Center performed the procedures, however, Aetna allegedly refused to live up to its end of the bargain. Of the $292,742 the Center billed for J.L.'s services, Aetna paid only $95,534.04.[5] Of the $420,750 the Center billed for D.W.'s services, Aetna paid only $40,230.32. In both cases Aetna declined to pay the Center anything for some services and paid

---

[4] This word appears to be "ant" in the notes. JA 65 (capitalization altered). For present purposes, we assume that this was merely a typo, but should it become clear with the benefit of discovery that "ant" has an independent meaning, that may factor into the District Court's consideration of any motion for summary judgment that Aetna may choose to bring.

[5] Part of J.L.'s procedure was performed by the Center at an Ambulatory Surgery Center and Aetna paid that facility $9,271.89. It is not apparent on the face of the complaint whether that payment was separate from or part of Aetna's obligation to the Center.

6

less than it allegedly agreed to for others, so the Center brought suit in New Jersey, claiming breach of contract, unjust enrichment, and promissory estoppel. Aetna moved to dismiss the claims as expressly preempted by section 514(a) or, alternatively, for failure to state a claim. In D.W.'s case, the Center then cross-moved to file a second amended complaint. The District Court granted Aetna's motion to dismiss in both cases, holding that section 514(a) expressly preempted all claims and, accordingly, denied the Center's motion to amend in D.W.'s case as futile. The Center timely appealed.

## II.  JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 1332, and we have jurisdiction under 28 U.S.C. § 1291. We review a dismissal on ERISA preemption grounds de novo, *see Menkes v. Prudential Ins. Co. of Am.*, 762 F.3d 285, 289 (3d Cir. 2014), and we will affirm if, accepting the veracity of factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor, the plaintiff failed to plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

## III.  DISCUSSION

Defining the contours of ERISA's express preemption provision is a nettlesome task. To frame the particular inquiry here, we review, first, the statutory backdrop for our decision and, second, relevant developments in the healthcare industry. With the perspective they provide, we then turn to the Center's claims.

**A. Statutory Background**

In 1974, in response to mounting public discontent with a pension system that often failed to provide employees with promised benefits, Congress enacted ERISA, which set forth uniform federal standards for not only pension plans, but also welfare plans—a class of benefit plans in which J.L.'s and D.W.'s healthcare plans fall.[6] Pub. L. No. 93-406, 88 Stat. 829, as amended, 29 U.S.C. § 1001 *et seq*.; *see Massachusetts v. Morash*, 490 U.S. 107, 112–13 (1989); *DiFelice v. Aetna U.S. Healthcare*, 346 F.3d 442, 454 (3d Cir. 2003) (Becker, J., concurring). ERISA's stated goal was "to promote the interests of employees and their beneficiaries in employee benefit plans" by ensuring benefit plans were well managed and would not leave plan participants short-changed. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983); *see also* 29 U.S.C. § 1001(b). To achieve this goal, ERISA "impose[d] participation, funding, and vesting requirements on pension plans" and "set[] various uniform standards, including rules concerning reporting, disclosure, and fiduciary responsibility, for both pension and welfare plans." *Shaw*, 463 U.S. at 91.

---

[6] Pension plans "provide[] income deferral or retirement income," while welfare plans "provide[] benefits for contingencies such as illness, accident, disability, death, or unemployment." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91 n.5 (1983) (citing 29 U.S.C. § 1002(1), (2), (3)). ERISA governs "any employee benefit plan if it is established or maintained . . . by any employer engaged in commerce," 29 U.S.C. § 1003(a), and on appeal neither party disputes that J.L.'s and D.W.'s healthcare plans are governed by ERISA.

8

These rules protect plan "participants,"[7] i.e., employees eligible to receive benefits under the plan, and "beneficiaries,"[8] i.e., individuals designated by participants or the terms of the plan to receive benefits.  For example, plans are required to share information about benefits with participants and beneficiaries, and to provide the Secretary of Labor with an annual report on the plan's financial health.  *See* 29 U.S.C. §§ 1021, 1022, 1023, 1024, 1025; *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 944–45 (2016) (detailing requirements). Those involved in the management of plans, i.e., plan "fiduciar[ies],"[9] must also act "for the exclusive purpose of . . .

---

[7] In full, a plan "participant" is:

[A]ny employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

29 U.S.C. § 1002(7).

[8] The statute defines "beneficiary" as: "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder."  *Id.* § 1002(8).

[9] An individual is a "fiduciary" of an ERISA plan "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a

9

providing benefits to participants . . . [and] defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

To provide a uniform enforcement mechanism for these rules and requirements and to guarantee that the cost of compliance would not be prohibitive, Congress also put in place two additional, complementary statutory provisions. First, it established federal causes of action under section 502(a) that form "a carefully integrated civil enforcement scheme." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 137 (1990) (internal quotation marks and citation omitted). Section 502(a) thus created a federal cause of action for plan beneficiaries and participants to recover benefits due under a plan or to enforce the terms of the plan. 29 U.S.C. § 1132(a)(1)(B).[10]

---

fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

[10] Although these provisions are not at issue in this case, we note, as relevant to ERISA preemption more generally, that the statute also made these the exclusive remedies available, at least for those parties. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004). Thus, any state law cause of action that "duplicates, supplements, or supplants" the remedies set forth in section 502(a) "conflicts with the clear congressional intent to make" those remedies exclusive and therefore triggers conflict preemption. *Id.*

Second, to make clear that ERISA's mandates supplanted the patchwork of state law previously in place and to ensure that plans were not crippled by the administrative cost of complying with not only ERISA, but also innumerable, potentially conflicting state laws, *see Gobeille*, 136 S. Ct. at 943–44; *Menkes*, 762 F.3d at 293, Congress enacted section 514(a)—a broad express preemption provision, which "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a); *see Ingersoll-Rand*, 498 U.S. at 138. The scope of "[s]tate laws" that may "relate to" a plan is expansive, encompassing "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1). This includes not only state statutes, but also common law causes of action. *See Menkes*, 762 F.3d at 294.

Recognizing that "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course," *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995), the Supreme Court has sought to craft a functional test for express preemption, instructing that a state law "relates to" an employee benefit plan if it has either (1) a "reference to" or (2) a "connection with" that plan, *Shaw*, 463 U.S. at 96–97. The first applies "[w]here a State's law acts immediately and exclusively upon ERISA plans . . . or where the existence of ERISA plans is essential to the law's operation." *Gobeille*, 136 S. Ct. at 943 (alternations in original) (citation omitted). The second covers state laws that "govern[] . . . a central matter of plan administration or interfere[] with nationally uniform plan administration," and those state laws that have "acute, albeit indirect, economic

11

effects [that] force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers." *Id.* (second alteration in original) (internal quotations marks and citations omitted). The latter inquiry is guided by "the objectives of the ERISA statute," which provide a blueprint for "the scope of the state law that Congress understood would survive." *Id.* (citation omitted).

With this statutory background in mind, we turn to developments in the healthcare industry that give rise to the Center's claims in this case.

### B.    Relevant Developments in the Healthcare Profession[11]

At the core of modern developments in welfare plan structure are two competing values: choice and cost. Historically, doctors in the United States worked on a "fee-for-service" basis. *Pegram v. Herdrich*, 530 U.S. 211, 218 (2000). Doctors established set fee schedules for their services and treated patients in accordance with their best judgment, billing

---

[11] We provide only a brief overview of the emergence of managed care as relevant to a basic understanding of the role of out-of-network providers in that setting and the different payment methods that pertain to this category of providers. A comprehensive treatment of the subject, to which we do not aspire here, can be found in Paul Starr's Pulitzer Prize-winning book *The Social Transformation of American Medicine*. *See generally* Paul Starr, The Social Transformation of American Medicine: The Rise of a Sovereign Profession and the Making of a Vast Industry (1982).

either the patient or an insurer for the costs of services after they were provided. *See id.* The incentive under this system generally was for healthcare providers to provide patients with "more care, not less," but that, in turn, gave rise to concerns about mounting healthcare costs that outstripped the value of care provided. *Id.* Responding to a perceived need to cut costs, starting in the 1960s and continuing through today, welfare plans increasingly shifted to "managed care" models of healthcare, epitomized by Health Maintenance Organizations (HMOs) and Preferred Provider Organizations (PPOs). *Id.* at 218–19; *see also DiFelice*, 346 F.3d at 464 (Becker, J., concurring); J. Scott Andresen, *Is Utilization Review the Practice of Medicine?, Implications for Managed Care Administrators*, 19 J. Legal Med. 431, 431 & n.6 (1998).

Managed care organizations aim to reduce healthcare costs without sacrificing quality of care by creating networks of doctors or preferred providers who enter into provider agreements with set fee arrangements and agree to adhere to certain cost-cutting measures in exchange for a steady stream of patients.[12] *See, e.g.*, *CardioNet, Inc. v. Cigna Health Corp.*,

---

[12] Perceived tension between the goals of cost effectiveness and quality of care has spawned a robust debate over the merits of managed care. *See, e.g.*, Kent G. Rutter, Note, *Democratizing HMO Regulation to Enforce the "Rule of Rescue,"* 30 U. Mich. J.L. Reform 147, 154 (1996) (explaining that proponents of managed care "maintain that their plans reduce health care costs by cutting waste and by avoiding serious illness through an emphasis on preventative care" while critics contend that the "cost-reducing techniques" harm the quality of care by "deny[ing] patients the 'medically necessary' treatment that HMOs are obligated to provide"

13

751 F.3d 165, 168–69 (3d Cir. 2014) (describing provider agreement); *Pascack Valley Hosp., Inc. v. Local 464 A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 402–03 (3d Cir. 2004) (citing *Blue Cross of Cal. v. Anesthesia Care Assocs. Med. Grp., Inc.*, 187 F.3d 1045, 1050–54 (9th Cir. 1999)) (same); *see also* Gregory F. Jacob, *A Pox on Both Their Houses:* North Cypress Med. Ctr. Op. Co., Ltd. v. Aetna Life Ins. Co., 26 ERISA Litig. Rep., Nov. 2018 (describing the bargain in-network providers strike: "reduced compensation" in exchange for "increased patient volume"). These organizations, in essence, restrict an individual's choice of healthcare providers in exchange for access to and cost effectiveness of the healthcare they provide.

In striving for efficiency, managed care organizations have a strong incentive simultaneously to bring providers in-network, which over time increases the network's bargaining power, and to reduce unexpected charges from out-of-network providers, whose billing practices may vary significantly from those of in-network providers. *See Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*, 890 F.3d 445, 452 (3d Cir. 2018). To achieve these interlocking goals, many plans, including J.L.'s and D.W.'s, restrict or discourage the use of out-of-network providers. *See* Kent G. Rutter, Note, *Democratizing HMO Regulation to Enforce the "Rule of Rescue*,*"* 30 U. Mich. J.L. Reform 147, 150 (1996). But as apparent in the consolidated cases before us, in-network providers are not always able to meet an individual's healthcare needs, and in other cases, an individual may seek

(citation omitted)). The merits of that evolving debate are beyond the scope of this opinion.

out-of-network care either unwittingly or out of necessity. These circumstances raise one of the questions at the core of this case: Must out-of-network providers seek payment from patients upfront, or are there viable alternative avenues to secure compensation for services provided?

Until recently, one oft-traveled avenue has been the "assignment of benefits," allowing the provider to submit claims to and receive payment directly from insurers in the patient's stead. *See CardioNet*, 751 F.3d at 179 (citation omitted). Assignments became commonplace because only plan "participant[s]" and "beneficiar[ies]," not healthcare providers, are expressly authorized to bring section 502(a) causes of action. 29 U.S.C. § 1132(a)(1)(B); *see Pascack Valley Hosp.*, 388 F.3d at 400; *see also DB Healthcare, LLC v. Blue Cross Blue Shield of Ariz., Inc.*, 852 F.3d 868, 875 (9th Cir. 2017) (collecting cases). But a valid assignment allows a healthcare provider to stand in the shoes of the "participant" or "beneficiary" and thereby to obtain not only the right to benefits due under the plan, but also the capacity to bring suit for non-payment under section 502(a). *See N. Jersey Brain & Spine Ctr. v. Aetna, Inc.*, 801 F.3d 369, 372–73 (3d Cir. 2015); *CardioNet*, 751 F.3d at 176 n.10. Thus, for a time, practitioners, almost universally, obtained assignments of benefits from patients. *Am. Orthopedic & Sports Med.*, 890 F.3d at 451.

Not so in recent years. To curtail this new fount of section 502(a) litigation, decrease their exposure to out-of-network claims, and encourage providers to come in network, insurers began inserting anti-assignment provisions in plans. *Id.* at 450. Anti-assignment provisions place out-of-network providers in the unenviable position of having to "bill[] the beneficiary

directly" and, should payment not be forthcoming, of having either to "rely on the beneficiary to maintain an ERISA suit" or to sue the beneficiary directly. *CardioNet*, 751 F.3d at 179 (citation omitted). Neither option for recouping compensation is likely to optimize resources or be good for business. *See Am. Orthopedic & Sports Med.*, 890 F.3d at 451. Nonetheless, as a matter of federal common law, we recently joined our sister circuits in holding that anti-assignment provisions, like other unambiguous terms in a contract, are enforceable. *See id.* at 453. While we left open the possibility that a patient could grant her provider a valid power of attorney to pursue claims for benefits on her behalf, *see id.* at 454–55, for most out-of-network providers, the rising prevalence of anti-assignment provisions signals the proverbial end of the road for relief under section 502(a). The anti-assignment provision in D.W.'s plan is emblematic of this trend.

In response, out-of-network providers like the Center have attempted to secure a new foothold—a promise of payment from the insurer in advance of any services. And that, in turn, has given rise to a different class of claims for non-payment—common law claims like those here, including for breach of contract, unjust enrichment, and promissory estoppel. Aetna does not dispute that such claims would not be preempted if they sought to enforce a "single standalone agreement" that made no mention of the plan and explicitly identified the discrete services to be performed and the "dollar amount" for those services. Oral Arg. Tr. at 35–36. In that circumstance, Aetna concedes, the claims would not "relate to" an ERISA plan but to a freestanding contract, and they would seek not to recoup benefits due under the terms of the plan, but to enforce obligations that arose out of an oral promise of payment made "precisely because there [was] no ERISA plan coverage."

16

*Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 246 (5th Cir. 1990).[13]  To put a fine point on it, those claims could not be brought under section 502(a), even by J.L. or D.W., because Aetna's alleged liability would flow not from the plans, but from an independent agreement reached between the Center and Aetna to which neither J.L. nor D.W. was a party.  *See Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 383, 385–86 (5th Cir.), *rehearing en banc granted*, 678 F.3d 940 (5th Cir.), *opinion reinstated*, 698 F.3d 229 (5th Cir. 2012) (en banc); *Hospice of Metro Denver, Inc. v. Grp. Health Ins. of Okla., Inc.*, 944 F.2d 752, 754, 756 (10th Cir. 1991); *Mem'l Hosp.*, 904 F.2d at 250.

And here we come to the crux of the problem.  As out-of-network providers migrate from accepting assignment of plan benefits from the insured to forming their own agreements with the insurers, many have not yet developed a standard form of contract.[14]  Instead, as borne out in the case before us, they

---

[13] *See also In Home Health, Inc. v. Prudential Ins. Co. of Am.*, 101 F.3d 600, 605–06 (8th Cir. 1996); *Meadows v. Emp'rs Health Ins.*, 47 F.3d 1006, 1010 (9th Cir. 1995); *Hospice of Metro Denver, Inc. v. Grp. Health Ins. of Okla., Inc.*, 944 F.2d 752, 754–55 (10th Cir. 1991).

[14] It is odd indeed that a pre-service agreement that sets forth the services to be provided alongside the dollar amounts to be paid is not yet common practice for out-of-network providers, particularly where a given provider operates as a large-scale, sophisticated business entity, as it would provide both parties with clarity and avoid the thicket of issues we find ourselves in today.

enter into ad hoc arrangements in which the provider agrees to render services (which are *not* covered by the terms of the plan) in exchange for a promise of payment by the insurer. But for those payment terms, as here, the parties sometimes default to the rate of payment under the plan. And that default resurrects the question of whether a subsequent claim for nonpayment then "relate[s] to" the plan and is therefore preempted after all. To that preemption question, we now turn.

## C. The Center's Breach of Contract and Promissory Estoppel Claims

As we confront this case at the motion to dismiss stage, the parameters of our analysis are shaped by our standard of review, and we must let the Center's claims proceed if, "accept[ing] all factual allegations in the complaint as true and draw[ing] all reasonable inferences" in the Center's favor, we find it has stated a claim "that is plausible on its face." *Menkes*, 762 F.3d at 290 (citation omitted). As explained below, the Center has plausibly pleaded breach of contract and promissory estoppel claims that do not "relate to" ERISA plans under either of the two definitions: (1) the causes of action do not require impermissible "reference to" ERISA plans because they are not claims for benefits due under an ERISA plan and are not otherwise premised on ERISA plans; and (2) the claims do not have a "connection with" ERISA plans because they do not arise out of a relationship ERISA intended to govern, because they do not "interfere[] with nationally uniform plan administration," and because holding these claims preempted would undermine ERISA's stated purpose.

18

1. **The Center's contract and promissory estoppel claims as pleaded do not require impermissible "reference to" ERISA plans**

Courts have devised a variety of formulations for the types of claims that make impermissible "reference to" ERISA plans. The Supreme Court has defined this class of claims to include not only those that "act[] immediately and exclusively upon ERISA plans," *Gobeille*, 136 S. Ct. at 943 (citation omitted), but also, as relevant here, those "premised on" the plan,[15] *Ingersoll-Rand*, 498 U.S. at 140. And claims in this second category, it has described variously as claims "where the existence of ERISA plans is essential to the law's operation," *Gobeille*, 136 S. Ct. at 943 (citation omitted); where the "court's inquiry must be directed to the plan," *Ingersoll-Rand*, 498 U.S. at 140; where "the existence of [an ERISA] plan is a

---

[15] We treat the "premised on" test as a subset of the inquiry into whether a state law has an impermissible "reference to" ERISA plans, consistent with Supreme Court precedent. *See Gobeille*, 136 S. Ct. at 943 (defining "reference to" as covering those state laws that act "immediately and exclusively upon ERISA plans . . . or where the existence of ERISA plans is essential to the law's operation" (alteration in original) (citation omitted)); *Cal. Div. of Labor Standards Enf't v. Dillingham Constr., N.A.*, 519 U.S. 316, 324–25 (1997) (concluding that "common-law cause[s] of action premised on the existence of an ERISA plan" are preempted under the "reference to" inquiry); *cf. Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 83–84 (3d Cir. 2012) (holding that claims "premised on" an ERISA plan have "a connection with or reference to such a plan" (citation omitted)).

19

critical factor in establishing liability," *id.* at 139–40; and where "there simply is *no* cause of action if there is no plan," *id.* at 140.

From these variegated formulations we distill two overlapping categories of claims "premised on" ERISA plans: (a) claims predicated on the plan or plan administration, e.g., claims for benefits due under a plan, *Menkes*, 762 F.3d at 296 (citing *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 47–48 (1987)); *Kollman v. Hewitt Assocs., LLC*, 487 F.3d 139, 150 (3d Cir. 2007), or where the plan "is a critical factor in establishing liability," *Ingersoll-Rand*, 498 U.S. at 139–40; *accord De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 815 & n.14 (1997); and (b) claims that "involve construction of [the] plan[]," *1975 Salaried Retirement Plan for Eligible Emps. of Crucible, Inc. v. Nobers*, 968 F.2d 401, 406 (3d Cir. 1992), or "require interpreting the plan's terms," *Menkes*, 762 F.3d at 294. Below we address: (a) whether the breach of contract and promissory estoppel claims plausibly seek to enforce obligations independent of the plans rather than claims for benefits due under the plans or claims otherwise impermissibly tethered to the plans; (b) whether the claims as pleaded require impermissible construction or interpretation of the plans; and (c) Aetna's arguments in support of preemption.

### a. The claims plausibly seek to enforce obligations independent of the plan

Whether the Center seeks to enforce obligations independent of the plan turns on whether the parties agreed (i) that Aetna would provide payment for all services necessary to perform the respective surgeries, leaving only the *amount* of payment pegged to the terms of the plan; or (ii) that the scope

20

of coverage, as well as payment, would be limited to the terms of the plans—leaving open the possibility that some services would not be compensated at all.

Aetna argues the latter, relying on *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 48 (1987), *Menkes*, 762 F.3d at 295–96, and *Kollman*, 487 F.3d at 150. But those cases are inapposite. The common law claims in each were brought by plan participants or beneficiaries, alleging either that the insurer or plan administrator, or an agent thereof, had improperly processed or misrepresented the benefits due under the plan. *Pilot Life*, 481 U.S. at 43–44, 48; *Menkes*, 762 F.3d at 294–96; *Kollman*, 487 F.3d at 150. Those plaintiffs sought to enforce legal obligations flowing from the four corners of their ERISA plans.

The claims here, on the other hand, arose precisely because there was no coverage under the plans for services performed by an out-of-network provider like the Center. In contrast to in-network providers whose relationship with Aetna is governed by a provider agreement that typically cross-references the ERISA plan and limits payment to "covered services," defined as those claims recognized as "medically necessary" under the terms of the relevant ERISA plan, *see, e.g.*, *Lone Star OB/GYN Assocs. v. Aetna Health Inc.*, 579 F.3d 525, 530 (5th Cir. 2009), out-of-network providers do not have pre-existing contractual relationships with the insurer. Thus, absent a separate agreement between Aetna and the Center, there was no obligation for the Center to provide services to the plan participants, no obligation for Aetna to pay the Center for its services, and no agreement that compensation would be

limited to benefits covered under the plan.[16]   And the complaints allege such separate agreements here:  As pleaded, the parties agreed that the Center would perform the surgeries and related medical care in exchange for payment from Aetna of a "reasonable amount" under J.L.'s plan and at the "highest in[-]network level" under D.W.'s plan for all component services (not merely those services covered under the terms of the plan).  JA 59, 201–02.

---

[16] We offer no opinion on the circumstances in which in-network providers could bring state law claims for breach of contract arising out of the provider agreement or an equitable cause of action, such as promissory estoppel or *quantum meruit*, arising out of an insurer's promise of payment without running afoul of section 514(a), which would depend on the content of the claims and the terms of the provider agreement. *See, e.g.*, *Pascack*, 388 F.3d at 403; *Kolbe & Kolbe Health & Welfare Benefit Plan v. Med. Coll. of Wis., Inc.*, 657 F.3d 496, 504–05 (7th Cir. 2011); *Lone Star*, 579 F.3d at 530; *Blue Cross*, 187 F.3d at 1050–54.  Nor do we suggest that out-of-network providers are categorically exempt from section 514(a), with carte blanche to file suit for services rendered to plan participants.  *See, e.g.*, *Access Mediquip*, 662 F.3d at 386–87 (holding section 514(a) preempts unjust enrichment and *quantum meruit* claims premised on obligations imposed by ERISA plans rather than an independent promise of payment). Whether any agreement was reached with a provider, and the extent to which the terms of that agreement are so intertwined with the plan as to "relate to" an ERISA plan, are questions that depend on the facts and circumstances of the given case.

Aetna's argument that the Center agreed to be bound by all terms and conditions of the plan—in effect, that it agreed to be paid as if it were an in-network provider—is simply not apparent on the face of the pleadings. In the case of J.L., the Center alleges that "Aetna contracted with [the Center] to provide multi-stage breast reconstruction surgery to J.L., along with related medical services, and to pay [the Center] a reasonable amount for those services according to the terms of the Plan." JA 201–02. Accepting the pleadings as true and drawing all inferences in the Center's favor, as we must at the motion to dismiss stage, we conclude that only the amount of payment and not the scope of services was to be determined in accordance with the terms of the plan; the services agreed to be compensated were all those required to perform J.L.'s procedure.

The same holds true in D.W.'s case. We may reasonably infer from notes attached to the complaint that the Center identified at least eighteen distinct CPT[17] codes associated with D.W.'s surgery; the Center also alleges that a Center employee faxed D.W.'s clinical information to Aetna, requesting a "single case agreement" and was assured that if Aetna agreed to pay for the procedure it would instead pay the Center "at the highest in[-]network level," JA 65, 67 (capitalization altered); and the Center alleges that an Aetna employee subsequently called the Center to confirm that Aetna "had agreed to approve

---

[17] "CPT" stands for "Current Procedural Terminology" and is defined in D.W.'s plan as "the most recent edition of an annually revised listing published by the American Medical Association which assigns numerical codes to procedures and categories of medical care." JA 81.

23

and pay" for the procedure, JA 59. These allegations plausibly support the inference that Aetna agreed to pay for *all* component services of D.W.'s surgery at the highest in-network level.

Aetna points to other evidence supporting a contrary inference. For example, it highlights the portion of the notes reflecting that it "do[es]n't neg[otiate] [single case agreements] an[y] longer," JA 65 (capitalization altered), and the language in its precertification letter[18]—which was addressed to D.W.

---

[18] The same day Aetna allegedly confirmed to the Center that it had approved D.W.'s surgery and would make payment at the "highest in[-]network level," Aetna also sent the Center a copy of a precertification letter, addressed to its insured, D.W., identifying fourteen services that had been approved. JA 59. The letter stated, among other things, that "[y]our plan does not have out-of-network benefits"; that coverage for the fourteen services was "approved, subject to the requirements of this letter"; and that approval was "at an in-network benefit level," subject to "any applicable dollar limits." Defs.' Mot. to Dismiss Ex. 2, ECF No. 12-2, at 1, 7–8. It also advised that reimbursement would "be based on standard coding and bundling logic and any mutually agreed upon contracted or negotiated rates, subject to any and all copays or coinsurance requirements"; that D.W. would "be responsible . . . for in-network cost-sharing requirements"; and that D.W. "should refer to the plan document to determine exclusions and limitations under the plan." *Id.* at 1, 7. Though the precertification letter is extraneous to the pleadings, we consider it because it is integral to the pleadings. *See Angstadt v. Midd-W. Sch. Dist.*, 377 F.3d 338, 342 (3d Cir. 2004).

but also copied to the Center—stating that "the member's eligibility for coverage under the plan [has been verified]" and that reimbursement would be based on "standard coding and bundling logic and any mutually agreed upon contracted or negotiated rates," Defs.' Mot. to Dismiss Ex. 2, ECF No. 12-2, at 1, 7. From this evidence, Aetna argues we may plausibly infer that the agreement was for the benefits and not merely the rate of payment set forth in the plan. Be that as it may, it does not render the Center's inferences implausible: The notes go on to document other statements supporting the Center's position, and Aetna concedes the precertification letter was drafted not for the benefit of the Center, but for the benefit of its insured, D.W.

In short, even assuming a different inference is also plausible, at the motion to dismiss stage, we must view the allegations in the light most favorable to the Center and draw all reasonable inferences in the Center's favor. When we do so, the claims as pleaded are not for benefits due under the plans. Nor are the claims otherwise impermissibly predicated on the plan or plan administration. Because, as alleged, it is Aetna's oral offers or oral promises (as the case may be) rather than the terms of the plan that define the scope of Aetna's duty, the plans are not "critical factor[s] in establishing liability."[19] *See Ingersoll-Rand*, 498 U.S. at 139–40.

---

[19] To establish its breach of contract claims, the Center may put forth evidence of oral offers and acceptances giving rise to non-plan-based duties, *see Williams v. Vito*, 838 A.2d 556, 560 (N.J. Super. Ct. Law. Div. 2003) ("[A]bsent a statute to the contrary, an oral offer and acceptance constitutes a binding agreement . . . ."), and evidence of its performance as valuable consideration for that binding agreement, *see Martindale v.*

### b. The claims as pleaded do not require interpretation or construction of ERISA plans

Expounding on the scope of this class of preempted claims, we have clarified that a claim that "turns largely on legal duties generated outside the ERISA context," and "requires only a cursory examination of the plan" is "not the sort of exacting, tedious, or duplicative inquiry that the preemption doctrine is intended to bar." *Iola*, 700 F.3d at 85 (internal quotation marks and citation omitted).

Aetna argues that the Center's claims are so enmeshed with the plans as to require interpretation or construction of the plans. But assuming the Center can establish an agreement to pay for all component services, it is not apparent from the pleadings why more than a cursory review of either J.L.'s or D.W.'s plan would be required to establish "a reasonable amount . . . according to the terms of the Plan," JA 201–02, or the "highest in[-]network level," JA 59, for each service.

---

*Sandvik, Inc.*, 800 A.2d 872, 878–79 (N.J. 2002) (citation omitted); *see also* Restatement (Second) of Contracts § 71 (1981). The same holds true for the promissory estoppel claims. As alleged, the plans are not "critical," *De Buono*, 520 U.S. at 815, to the demonstration of "(1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment," *Toll Bros., Inc. v. Bd. of Chosen Freeholders*, 944 A.2d 1, 19 (N.J. 2008).

In neither its briefing nor at oral argument did Aetna explain why these determinations of in-network payment rates would be particularly complex or require careful study of the intricacies of the plans. To the contrary, the reasonable inference from the pleadings is that, consistent with representations Aetna has made in other cases, the determination is as simple as checking the "usual, customary, and reasonable ('UCR') rate . . . based on an industry-standard schedule" for the services in question, *see, e.g.*, *McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.*, 857 F.3d 141, 144 (2d Cir. 2017), or reviewing the fee schedule attached to Aetna's in-network provider agreements, *see Lone Star*, 579 F.3d at 530. The former would be precisely the type of "cursory examination of the plan" that we have held does not trigger express preemption, *see Iola*, 700 F.3d at 85, and the latter would not require any examination of the plan, but only of the fee schedule Aetna uses with its providers, *see Kolbe & Kolbe Health & Welfare Benefit Plan v. Med. Coll. of Wis., Inc.*, 657 F.3d 496, 504–05 (7th Cir. 2011). Such inquiries do not entail "the sort of exacting, tedious, or duplicative inquiry that the preemption doctrine is intended to bar." *Iola*, 700 F.3d at 85.

### c. Aetna's counterarguments

Aetna offers essentially two counterarguments. Neither is persuasive.

First, it contends that any reference to an ERISA plan in the calculation of damages—no matter the degree of examination required—triggers express preemption. But that argument is belied by *Iola*, where we held that misrepresentation claims based on statements made prior to the adoption of an ERISA

27

plan were not preempted even though establishment of those claims, and in turn the court's assessment of damages, "require[d] . . . a cursory examination of the plan provisions," including "whether the representations . . . were at odds with the plan itself, or with the plaintiffs' understanding of the benefits afforded by the plans." 700 F.3d at 85. Likewise, the Center's core contention—that oral promises of payment induced it to act to its detriment—and the proof that would be required involve, at most, only a "cursory examination" of plan provisions "turn[ing] largely on legal duties generated outside the ERISA context." *Id.* (internal quotation marks and citation omitted).[20]

Second, Aetna argues that the Center's claims are premised on ERISA plans because the plans required preapproval of

---

[20] The sole authority on which Aetna relies, *Nobers*, is also readily distinguishable. *Nobers* held common law claims preempted because the calculation of damages required "construction of [an] ERISA plan[]." 968 F.2d at 406. But the *Nobers* plaintiffs were a class of employees who alleged that "they [sh]ould have received substantially greater pension and related benefits," *id.* at 404, assessing damages therefore would have required benefit calculations that "sit[] within the heartland of ERISA," *Iola*, 700 F.3d at 84; *see Kollman*, 487 F.3d at 149–50. The Center, on the other hand, does not allege that Aetna's liability flows from its promise to provide J.L. and D.W. benefits under their ERISA plans; it alleges "a separate promise that references various [ERISA] benefit plans, none of which directly applies to [the Center] by its terms, as a means of establishing the value of that promise," *Stevenson v. Bank of N.Y. Co.*, 609 F.3d 56, 60–61 (2d Cir. 2010).

J.L.'s and D.W.'s surgeries. Aetna places great weight on this point, presumably because before concluding that an out-of-network provider's state law claims were not completely preempted by section 502(a),[21] the Second Circuit in *McCulloch* observed that the provider "was not required by the plan to pre-approve coverage for the surgeries that he performed." 857 F.3d at 150–51. Of course, we are not bound by this out-of-circuit precedent, but Aetna misapprehends it in any event.

In context, the *McCulloch* court was contrasting a prior case where it had found that the preapproval required of *in-network* providers under the plan was "inextricably intertwined with the interpretation of Plan coverage and benefits," *Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 330, 332 (2d Cir. 2011); *see McCulloch*, 857 F.3d at 150–51. Moreover, the court went on to explain that when it came to out-of-network providers, the ERISA plan imposed a duty only on the plan participant or beneficiary to seek precertification; as they are neither parties to the plan nor parties to an in-network provider agreement, there was no corresponding duty on out-of-network providers. *McCulloch*, 857 F.3d at 150–51, 151 n.7. Rather, the provider there, like the Center, "called Aetna for [its] own benefit to decide whether [it] would accept or reject a potential patient who sought [its] out-of-network

---

[21] Complete preemption is a separate, jurisdictional doctrine that in this context arises out of section 502(a). *Davila*, 542 U.S. at 210. Under this doctrine, if a litigant could have brought a cause of action under section 502(a) and if "no other independent legal duty . . . is implicated by [the] defendant's actions," the claim is federal in nature. *Id.*

services," *id.* at 151, and the plan "simply provide[d] the context for" the out-of-network provider's claim, *id.* at 149.

In short, *McCulloch*, if anything, weighs against express preemption here, as does other case law: The mere fact that a claim arises against the factual backdrop of an ERISA plan does not mean it makes "reference to" that plan. *See Travelers*, 514 U.S. at 661 ("[P]re-emption does not occur . . . if the state law has only a tenuous, remote, or peripheral connection with covered plans . . . ." (second alteration in original) (citation omitted)); *Iola*, 700 F.3d at 85 (holding section 514(a) does not preempt misrepresentation claims arising out of statements made about an ERISA plan prior to the plan's adoption); *Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 983–84 (9th Cir. 2001) (concluding that state law claims were not expressly preempted even though there was "clearly some relationship" to an ERISA plan); *see also Morris B. Silver M.D., Inc. v. Int'l Longshore & Warehouse Union*, 206 Cal. Rptr. 3d 461, 472 (Ct. App. 2016) ("[T]he fact [that] an ERISA plan is an initial step in the causation chain, without more, is too remote of a relationship with the covered plan to support a finding of preemption.").

Because the Center's claims, as pleaded, neither seek benefits due under the plans, nor require more than a cursory examination of the plans, they do not make impermissible "reference to" the plans.

**2. The Center's contract and promissory estoppel claims do not have a "connection with" ERISA plans**

State laws have a "connection with" ERISA plans if they "govern, or interfere with the uniformity of, plan administration," *Gobeille*, 136 S. Ct. at 943, or if the "acute, albeit indirect, economic effects of the state law force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers," *id.* (internal quotation marks and citation omitted). In making this assessment, we consider "the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive and the nature of the effect of the state law on ERISA plans." *Id.* (internal quotation marks and citation omitted); *accord Menkes*, 762 F.3d at 294. Distilling these tests, we and other Courts of Appeals focus primarily on whether claims (a) "directly affect the relationship among the traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries," *Mem'l Hosp.*, 904 F.2d at 245, 248 (citing *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 833 (1988)); *Access Mediquip*, 662 F.3d at 385–86 (same); (b) interfere with plan administration, *Menkes*, 762 F.3d at 295–96; *Access Mediquip*, 662 F.3d at 385; or (c) undercut ERISA's stated purpose, *Iola*, 700 F.3d at 84–85; *Kollman*, 487 F.3d at 149. As pleaded, it is plausible that the Center's claims do not implicate any of these avenues for an impermissible "connection with" ERISA plans.

31

### a. The claims plausibly arise out of a relationship that ERISA did not intend to govern

ERISA governs relationships among "the employer, the plan and its fiduciaries, and the participants and beneficiaries." *Mem'l Hosp.*, 904 F.2d at 245 (citing *Mackey*, 486 U.S. at 833); *accord Access Mediquip*, 662 F.3d at 385–86. As our sister circuits have recognized, ERISA struck a "bargain" between the interests of participants and beneficiaries on the one hand and insurers on the other: Section 502(a) created federal causes of action that allow plan participants and beneficiaries to enforce ERISA's mandates, and section 514(a) limits potential sources of plan liability, providing employers and plan administrators with some measure of security. *See, e.g.*, *Mem'l Hosp.*, 904 F.2d at 249.

Critically, however, out-of-network healthcare providers "were not . . . party to this bargain." *Id.* Absent the assignment of benefits, a healthcare provider may not pursue its own section 502(a) cause of action, *N. Jersey Brain & Spine Ctr.*, 801 F.3d at 372, and section 514(a) works predominately to the benefit of insurers, employers, and plan participants by reducing compliance and litigation costs and thereby increasing the resources employers have to invest in providing high-quality plans for their employees, *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 379 (2002). Health care providers such as the Center orbit the periphery of this bargain, but their rights and remedies are not delineated in ERISA's substantive or remedial provisions.

For this reason, the Courts of Appeals have overwhelmingly held that claims akin to the Center's are not expressly preempted because, as pleaded, they arise out of a

32

relationship ERISA did not intend to govern at all. *See Access Mediquip*, 662 F.3d at 385–86; *In Home Health, Inc. v. Prudential Ins. Co. of Am.*, 101 F.3d 600, 605–06 (8th Cir. 1996); *Meadows v. Emp'rs Health Ins.*, 47 F.3d 1006, 1009–11 (9th Cir. 1995); *Lordmann Enters., Inc. v. Equicor, Inc.*, 32 F.3d 1529, 1533–34 (11th Cir. 1994); *see also Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health & Welfare Tr. Fund*, 538 F.3d 594, 599–601 (7th Cir. 2008) (citing this line of cases approvingly); *Gerosa v. Savasta & Co.*, 329 F.3d 317, 324 (2d Cir. 2003) (collecting cases). Indeed, the only circuit to reach the opposite conclusion is the Sixth Circuit in *Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272 (6th Cir. 1991), which has been aptly criticized as a "poorly reasoned outlier in the face of the strong trend in the bulk of the cases considering healthcare-provider claims," *Franciscan Skemp*, 538 F.3d at 601.[22] The Department of Labor, too, has noted the "overwhelming and persuasive consensus" that state law claims brought by third-party health

---

[22] The *Cromwell* majority held that the provider's state law claims were all brought "as grounds for the recovery of *benefits* from the [ERISA] plan for health care services rendered." 944 F.2d at 1276 (emphasis added). But it painted with too broad a brush: While this may have been true for the breach of contract and good faith claims that were brought pursuant to an assignment of benefits and for breach of the ERISA plan itself, it was not for the promissory estoppel and negligent misrepresentation claims, where the legal duty allegedly breached arose not from the plan but from oral promises made by plan administrators and where the healthcare providers were seeking damages for reliance upon those promises. *See id.* at 1283–85 (Jones, J., dissenting).

33

care providers against ERISA plan administrators implicate "separate relationship[s]" from those ERISA was intended to govern and thus, generally, "are not . . . preempted under section 514."[23]

We join that consensus today and conclude that the relationship between the Center, an out-of-network provider, and Aetna, as plan administrator, does not itself create an impermissible "connection with" the plans in this case.

---

[23] Brief for the Secretary of Labor as Amicus Curiae in Support of Plaintiff-Appellant at 23, 25, *McCulloch Orthopaedic Surgical Servs., PLLC v. United Healthcare Ins. Co.*, No. 15-2144 (2d Cir. Oct. 22, 2015), https://www.dol.gov/sol/media/briefs/mcculloch_2015-10-22.pdf. While the Secretary's brief is properly the subject of judicial notice, *see Vanderklok v. United States*, 868 F.3d 189, 205 n.16 (3d Cir. 2017), it is entitled to only *Skidmore* deference, both because it is a litigation position, *Smiley v. E.I. Dupont de Nemours & Co.*, 839 F.3d 325, 329 (3d Cir. 2016), and because "[w]e do not defer to an agency's view concerning preemption, but such views . . . are entitled to respect . . . to the extent [they] ha[ve] the power to persuade," *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 773 n.11 (3d Cir. 2018) (first and second alterations added) (internal quotation marks omitted) (quoting *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 693–94 (3d Cir. 2016)); *see also Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

### b. As pleaded, the claims do not interfere with the administration of either plan

Aetna next argues the Center's claims have a "connection with" the plans because litigating those claims would impermissibly interfere with plan administration and have severe economic consequences for plan coverage and insurer choices. Specifically, Aetna urges us to adopt the view of the Fifth Circuit in *Access Mediquip*, 662 F.3d at 386–87, that litigating the provider's unjust enrichment and *quantum meruit* claims in that case would open the floodgates for any healthcare provider to challenge the compensation it receives under an ERISA plan.

We decline Aetna's suggestion because those floodgate concerns are inapplicable. The unjust enrichment and *quantum meruit* claims in *Access Mediquip* "depend[ed] on [the provider's] assertion that without its services the patients' ERISA plans would have obliged [the insurer] to reimburse a different provider for the same services." 662 F.3d at 378. Those claims arose, in other words, not from any independent agreement, oral or otherwise, to provide services for payment, but from the obligations under the plan. For that reason, the provider sought recovery "only to the extent that the patients' ERISA plans confer on their participants and beneficiaries a right to *coverage* for the services provided." *Id.* at 386 (emphasis added).

Here, by contrast, the Center's breach of contract and promissory estoppel claims do not allege that J.L.'s and D.W.'s plans covered the services at all; instead, the Center alleges that Aetna must pay the costs of these services only because, and to the extent, it promised the Center that it would. *See Morris B.*

35

*Silver*, 206 Cal. Rptr. 3d at 472 n.16 (2016) (distinguishing *Access Mediquip* on this ground). The Center's claims, in other words, are much more analogous to the misrepresentation claim that the *Access Mediquip* court held was not preempted because it arose out of an obligation independent from the plan. 662 F.3d at 384–85. And like that claim, the Center's claims—at least on the face of the complaints—would merely result in a one-time payment of damages based on the specific agreement reached by the parties that does not impermissibly interfere with plan administration. *Cf. Iola*, 700 F.3d at 85 (holding that assessing damages against insurers "for pre-plan fraud does not affect the administration or calculation of benefits" (citation omitted)). As a result, allowing these claims does not impermissibly interfere with plan administration. Nor does it preclude insurers like Aetna (or providers like the Center) from minimizing the risk of unanticipated liability by formalizing their agreements and thus identifying both the particular services to be provided and the dollar amounts to be paid (or particular fee schedule to be used) for those services.

What is more, Aetna's insistence that there will be staggering downstream economic effects if these claims are allowed to proceed is belied by experience. For the past thirty years, since the Fifth Circuit's seminal decision in *Memorial Hospital*, our sister circuits have held that claims akin to the Center's are not expressly preempted, and, lo and behold, the sky has not fallen. *See, e.g.*, *Access Mediquip*, 662 F.3d at 384–86; *In Home Health*, 101 F.3d at 604–06; *Meadows*, 47 F.3d at 1009–11; *Lordmann*, 32 F.3d at 1533–34; *see also Franciscan Skemp*, 538 F.3d at 601. In following suit today, we foster the coherence and "uniform[ity]" in ERISA law that the Supreme Court has encouraged. *See Gobeille*, 136 S. Ct. at 944.

36

### c. Holding the claims preempted at this phase of the litigation would undercut ERISA's purposes

In evaluating claims' "connection with" ERISA plans, the Supreme Court has instructed that we must consider "the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive and the nature of the effect of the state law on ERISA plans." *Gobeille*, 136 S. Ct. at 943 (internal quotation marks and citation omitted). Here, those considerations support the conclusion that the Center's claims, as pleaded, are not preempted.

ERISA's "principal object" was "to protect plan participants and beneficiaries." *Id.* at 946 (quoting *Boggs v. Boggs*, 520 U.S. 833, 845 (1997)); *see* 29 U.S.C. § 1001(b) (highlighting "the interests of participants in employee benefit plans and their beneficiaries"). For those parties, who benefit from both ERISA-created rights and ERISA's civil enforcement scheme, it makes good sense that a state law remedy that "duplicates, supplements, or supplants" the remedies set forth in section 502(a) runs afoul of "clear congressional intent to make" those remedies exclusive, triggering conflict preemption. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004). The resulting circumscription of remedies available to participants and beneficiaries was part and parcel of the bargain struck in establishing ERISA's substantive guarantees.

But protection of plan participants and beneficiaries is not advanced by extending express preemption to out-of-network providers and limiting their universe of remedies to those

37

outlined in section 502(a). In cases such as D.W.'s, where a plan contains an anti-assignment provision, express preemption would leave the provider with only one option: Sue the patient, hoping that the patient either is willing or able to pay significant, unexpected costs or has the interest and wherewithal to file suit against the insurer under section 502(a).[24] Neither circumstance, however, is likely to compensate the provider for the harm it suffered in reliance on the insurer's promise of payment. The first will rarely come to pass and even more rarely at the full amount to which the provider and insurer agreed; the second would be limited in any event to the benefits to which the patient was entitled under the plan, not the full payment promised by the insurer. And the prospect of suing patients to eventually recover from their insurers is unpalatable, to say the least, from a reputational and business development standpoint, not to mention the damage it would cause to the doctor–patient relationship.

Although Congress has narrowed the universe of remedies available to participants and beneficiaries, we will not assume

---

[24] At oral argument, Aetna suggested that insurers might allow providers to seek an assignment of benefits notwithstanding an anti-assignment provision in the plan. But it cites no authority suggesting this practice is common, let alone required; nor does it offer a sound reason for leaving the payment of providers' compensation to the whim of insurers. Quite the contrary, as our sister circuits have recognized, and as we explore in more detail below, providers will likely respond to this uncertainty by either refusing to treat patients or imposing barriers to care that will ultimately harm patients. *E.g.*, *Mem'l Hosp.*, 904 F.2d at 247–48.

that it intended simultaneously to strip healthcare providers, such as the Center, of any meaningful remedy, particularly where the guidance from the Supreme Court, though limited, indicates otherwise. *See Mackey*, 486 U.S. at 834 (1988) (holding that ERISA does not preempt "state-law methods for collecting money judgments . . . [because] otherwise, there would be no way to enforce such a judgment won against an ERISA plan").[25]

Indeed, if anything, that would disserve ERISA's statutory objectives. To accept Aetna's argument would be to accept the troubling proposition that an out-of-network provider's right to

---

[25] *See also Tr. of the AFTRA Health Fund v. Biondi*, 303 F.3d 765, 782 (7th Cir. 2002) (Because ERISA "does not provide *any* mechanism for plan administrators or fiduciaries to recoup monies defrauded from employee benefit trust funds by plan participants, garden-variety state-law tort claims must, as a general matter, remain undisturbed . . . ."); *Gerosa*, 329 F.3d at 329–30 (concluding it is "implausible that Congress intended" a result that "would leave [an] affected plan with no means for making up its shortfalls"); *Hospice of Metro Denver*, 944 F.2d at 755 (reasoning that "if health care providers have no recourse under ERISA or under state law, there will be reluctance on the part of health care providers to extend care without prepayment"); *In Home Health*, 101 F.3d at 606–07 ("If providers have no recourse under either ERISA or state law . . . , [they] will be understandably reluctant to accept the risk of non-payment, and may require up-front payment by beneficiaries—or impose other inconveniences—before treatment will be offered." (quoting *Mem'l Hosp.*, 904 F.2d at 247–48)).

recourse may be bargained away by insurers and plan participants in the terms of an ERISA plan to which the provider is not a party and which it likely has had no opportunity to review before it provides care. It would in effect allow insurers to illegitimately supplement their provider network by making promises of payment to induce the provision of services, safe in the knowledge that those out of network would have no recourse for breach of those promises. The consequence, as recognized by other Courts of Appeals, would be for providers to begin to require up-front payments from patients or to "deny care or raise fees to protect themselves against the risk of noncoverage." *Lordmann*, 32 F.3d at 1533; *accord In Home Health*, 101 F.3d at 606–07; *Mem'l Hosp.*, 904 F.2d at 247–48. That is a far cry from "protect[ing] plan participants and beneficiaries." *Gobeille*, 136 S. Ct. at 943 (citation omitted). "[T]he objectives of the ERISA statute," *id.*, thus also indicate the Center's claims do not have an impermissible "connection with" the ERISA plans.

## D.     The Center's Unjust Enrichment Claims

We reach the opposite conclusion for the Center's unjust enrichment claims, which we hold do entail an impermissible "reference to" the ERISA plans.

To establish a claim of unjust enrichment under New Jersey law, the Center must demonstrate that Aetna "received a benefit and that retention of that benefit without payment would be unjust." *Thieme v. Aucoine-Thieme*, 151 A.3d 545, 557 (N.J. 2016) (citation omitted). The Center must also show "that it expected remuneration from [Aetna] at the time it performed or conferred [that] benefit on [Aetna] and that the failure of remuneration enriched [Aetna] beyond its contractual

40

rights." *Id.* (citation omitted). No unjust enrichment claim may proceed absent a showing of a benefit—indeed, "the basis of liability [for an unjust enrichment claim] springs from the benefit conferred." *St. Paul Fire & Marine Ins. Co. v. Indemnity Ins. Co. of N. Am.*, 158 A.2d 825, 827 (N.J. 1960) (citation omitted); *see Callano v. Oakwood Park Homes Corp.*, 219 A.2d 332, 334 (N.J. Super. Ct. App. Div. 1966).

Given those elements, whether a given unjust enrichment claim is preempted may turn on the nature of the benefit: The claim will be preempted if that benefit "is premised on . . . the existence of a[n ERISA] plan," *Ingersoll-Rand*, 498 U.S. at 140, or if "the existence of ERISA plans is essential to the law's operation," *Gobeille*, 136 S. Ct. at 943 (quoting *Cal. Div. of Labor Standards Enf't v. Dillingham Constr., N.A.*, 519 U.S. 316, 325 (1997)). Put differently, if "the court must find . . . that an ERISA plan exists," *Ingersoll-Rand*, 498 U.S. at 140, to establish that element, such that "there simply is *no* cause of action if there is no plan," *id.*, then "the court's inquiry must be directed to the plan," and "this . . . cause of action 'relate[s] to' an ERISA plan," *id.* (second alteration in original) (citation omitted).

Here, the "benefit conferred" is indeed premised on the existence of the plan. That is because in a case like the Center's, where a healthcare provider claims unjust enrichment against an insurer, the benefit conferred, if any,[26] is not the

---

[26] We note that district judges in New Jersey have disagreed over whether a healthcare provider's provision of services to an insured may ever constitute a "benefit" to an insurer for purposes of an unjust enrichment claim. *Compare Plastic Surgery Ctr., LLC v. Oxford Health Ins., Inc.*, No. 18-cv-2608,

provision of the healthcare services *per se*, but rather the discharge of the obligation the insurer owes to its insured.  As New Jersey's highest court observed long before the advent of ERISA, the essence of an unjust enrichment cause of action against an insurer is that "the [insurer] is under a legal duty to provide the person injured with medical or surgical attendance," and "the physician . . . dutifully intervene[d] in the [insurer's] affairs and perform[ed] its obligation." *Rabinowitz v. Mass. Bonding & Ins. Co.*, 197 A. 44, 47 (N.J. 1938) (citation omitted).  And the Center's own complaint—describing the benefits at issue as "permitting Aetna to fulfill its contractual obligation to D.W. to pay for medically

2019 WL 4750010, at *5–6 (D.N.J. Sept. 30, 2019) (concluding that a healthcare provider may not bring an unjust enrichment claim against an insurer because the "benefit is derived solely by the insured party" (citation omitted)), *with Demaria v. Horizon Healthcare Servs., Inc.*, No. 2:11-cv-7298, 2013 WL 3938973, at *6 (D.N.J. July 31, 2013) (allowing an unjust enrichment claim brought by a healthcare provider against an insurer to proceed).  Those that have held the benefit lies solely with the insured have done so in reliance upon the reasoning of *Travelrs Indemnity Co. of Connecticut v. Losco Group, Inc.*, 150 F. Supp. 2d 556 (S.D.N.Y. 2001), specifically that "[i]t is counterintuitive to say that services provided to an insured are also provided to its insurer," *id.* at 563.  *Travelers Indemnity*, however, dealt with a claim of *quantum meruit*, not a claim of unjust enrichment, *id.* at 562, and its reasoning is at odds with the decisions of the New Jersey state courts that have allowed these types of unjust enrichment claims to proceed. *See, e.g.*, *Rabinowitz v. Mass. Bonding & Ins. Co.*, 197 A. 44, 46–47 (N.J. 1938).

necessary surgeries," JA 61, and allowing Aetna to "fulfill[] [its] contractual obligation to J.L.," JA 204—makes plain that this is its theory.

What it fails to appreciate, however, is that in the modern era, when the insured is a plan participant, the "contractual obligation" is none other than the insurer's duty to its insured *under the terms of the ERISA plan*. That point was not lost on the Fifth Circuit when it distinguished in *Access Mediquip* between the provider's state law misrepresentation claim— which was based on a law that "d[id] not purport to regulate what benefits [the insurer] provides to the beneficiaries of its ERISA plans, but rather what representations it makes to third parties about the extent to which it will pay for their services," 662 F.3d at 385—and its unjust enrichment claim, for which the provider could recover "only to the extent that the patients' ERISA plans confer on their participants and beneficiaries a right to coverage for the services provided,"[27] *id.* at 386. And

---

[27] The *Access Mediquip* court reached the same conclusion as to the provider's claim of *quantum meruit*, 662 F.3d at 386–87, although it is unclear how the analysis would bear out, at least with respect to the "reference to" part of the express preemption test, under New Jersey law which does not require a showing of a benefit conferred to establish a *quantum meruit* claim. *See Starkey, Kelly, Blaney & White v. Estate of Nicolaysen*, 796 A.2d 238, 242–43 (N.J. 2002) (recovery under a *quantum meruit* claim requires "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." (citation omitted)).

the Eighth, Ninth, Tenth, and Eleventh Circuits likewise have recognized that a misrepresentation claim brought by a third-party healthcare provider, given its legal basis independent of the ERISA plan, is not necessarily preempted. *See In Home Health*, 101 F.3d at 605–07; *Meadows*, 47 F.3d at 1009–11; *Hospice of Metro Denver*, 944 F.2d at 755–56; *Lordmann*, 32 F.3d at 1533–34; *cf. Iola*, 700 F.3d at 84–85 (holding a misrepresentation claim preempted based on statements that occurred after the participants had entered into an ERISA plan but allowing a misrepresentation claim based on statements made before the participants had entered into the plan to proceed).

That distinction is no less important here. To put a fine point on it, Aetna's duties to J.L. and D.W. appear to arise specifically from plan provisions stating that "[i]f Aetna refers [the insured] to a Non-Network provider, the service or supply shall be covered as a network service or supply," JA 108 (D.W.'s plan); *accord* JA 248 (J.L.'s plan) (similar), and that "Aetna is fully responsible for payment to the health care professional and the [insured]'s liability shall be limited to any applicable Network Copayment, Coinsurance or Deductible for the service or supply," JA 108; *accord* JA 248 (similar). Thus, unlike the Center's claims of breach of contract or promissory estoppel, which seek to enforce a promise of payment independent of any plan-based obligation, *see supra* at pages 16–35, its unjust enrichment claims require "the court [to] find . . . that an ERISA plan exists," *Ingersoll-Rand*, 498 U.S. at 140, in order to demonstrate that Aetna "received a benefit"—i.e., the discharge of its duties under that plan—"and that retention of that benefit without payment would be unjust," *Thieme*, 151 A.3d at 557 (citation omitted). Likewise, because the benefit involves a plan-based duty, "there simply

44

is *no* cause of action [*for unjust enrichment*] if there is no plan." *Ingersoll-Rand*, 498 U.S. at 140. This claim is thus squarely preempted by section 514(a).

\*     \*     \*

ERISA is a "comprehensive and reticulated statute," *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985) (citation omitted), but its complexity does not relieve us of our duty to carefully assess the parameters of the claims before us to determine whether they "relate to" ERISA plans. Although section 514(a) is robust, *Menkes*, 762 F.3d at 293, it is not all encompassing, *Gobeille*, 136 S. Ct. at 943. Because the Center plausibly alleged breach of contract and promissory estoppel claims that do not contain an impermissible "reference to" or "connection with" ERISA plans, the District Court erred in dismissing those claims as preempted at this stage of the litigation,[28] even as it properly dismissed the unjust enrichment claims as preempted.

---

[28] Because the District Court denied the Center's motion to file a second amended complaint in D.W.'s case based on an erroneous application of express preemption that ruling too must give way. We review a denial of a motion to amend for abuse of discretion, *Menkes*, 762 F.3d at 290, except where, as here, "amendment is denied for legal reasons drawing de novo review," *Mullin v. Balicki*, 875 F.3d 140, 150 (3d Cir. 2017) (emphasis omitted). Aetna argues that we should affirm the District Court's denial of the motion to amend, at least as to the Center's breach of contract claim, because the Center failed to state a claim. In support of this argument, it points to a line from the District Court's opinion stating that the Center "does not properly allege the elements of an enforceable contract."

45

### III.    CONCLUSION

For the foregoing reasons, we will affirm in part and reverse in part and remand to the District Court for further proceedings consistent with this opinion.

---

JA 25.  But it appears the District Court was assessing only the precertification letter.  Under New Jersey law, "absent a statute to the contrary, an oral offer and acceptance constitutes a binding agreement," *Williams v. Vito*, 838 A.2d 556, 560 (N.J. Super. Ct. Law. Div. 2003); *cf.* N.J. Stat. Ann. 25:1-5 (identifying the limited circumstances that trigger New Jersey's statute of frauds), and Aetna's payment of a good portion of both J.L.'s and D.W.'s surgeries indicates that it, too, recognized the existence of some agreement with the Center.